83 F.3d 1060
 42 ERC 1661, 26 Envtl. L. Rep. 20,995,
44 Fed. R. Evid. Serv. 349,
96 Cal. Daily Op. Serv. 3205,
96 Daily Journal D.A.R. 5299,
96 Daily Journal D.A.R. 7536
 MARBLED MURRELET, (Brachyramphus marmoratus); Environmental
Protection Information Center, Plaintiffs-Appellees,
v.
Bruce BABBITT, Secretary, Department of Interior; John
Turner, Director, United States Fish and Wildlife
Service, et al., Defendants,
and
Pacific Lumber Company, Defendant-Appellant.
 No. 95-16504.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 14, 1996.
Decided May 7, 1996.
As Amended on Denial of Rehearing and Suggestion for
Rehearing En Banc June 26, 1996.
 
 Walter R. Allan, San Francisco, California, for defendant-appellant.
 Macon Cowles, Boulder, Colorado, for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California; Louis Charles Bechtle, District Judge, Presiding.
 Before: THOMPSON and TASHIMA, Circuit Judges, and WILSON,* District Judge.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Pacific Lumber Company wanted to harvest trees on a portion of its land in an old-growth forest known as Owl Creek. The Environmental Protection Information Center (EPIC) brought suit in its own name and in the name of the marbled murrelet to enjoin Pacific Lumber's proposed logging plan. EPIC alleged that the logging would result in a "take" of marbled murrelets in violation of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 et seq. After an eight-day bench trial, the district court issued a permanent injunction enjoining Pacific Lumber from harvesting the trees.
 
 
 2
 In this appeal, Pacific Lumber challenges the district court's injunction on the ground that the Supreme Court's opinion in Babbitt v. Sweet Home Chap. of Communities for a Great Oregon, --- U.S. ----, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), requires evidence of past harm to a protected species before an injunction may issue, and the district court's injunction was founded upon a threat of future harm. Pacific Lumber also contends the evidence was insufficient to support the findings of harassment and harm because EPIC's scientific evidence of impaired breeding was unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
 
 
 3
 We have jurisdiction over the final judgment of the district court pursuant to 28 U.S.C. § 1291, and we affirm.[1]
 
 
 4
 * FACTS
 
 
 5
 The marbled murrelet is an extremely secretive seabird that flies miles inland to breed in solitary nests in old-growth forests. Each year breeding murrelets return to the same forest "stand" or grouping of trees. They do not build a nest; rather, the female lays a single egg each year in a natural depression in a moss-covered limb of a large old-growth tree. Marbled murrelet nests are extremely susceptible to avian predators such as ravens, hawks, and jays. Some experts believe that, even under ideal circumstances, more than 50% of marbled murrelet nests fall victim to predation. Marbled murrelets do not breed until they are several years old, and adults do not necessarily breed every year.
 
 
 6
 The population of marbled murrelets has declined rapidly in this century. The most significant factor in this decline has been the destruction of old-growth coastal coniferous forests. More than 96% of the marbled murrelet's nesting habitat has been lost to commercial logging in the past 150 years. On September 28, 1992, the marbled murrelet was listed as a "threatened species" under the ESA.
 
 
 7
 Owl Creek is an isolated 440 acre stand of contiguous old-growth redwood and Douglas fir trees located 22 miles inland from the Pacific coast in Humboldt County, California. It is completely surrounded by previously harvested clear-cut and second-growth forests. Pacific Lumber's Timber Harvest Plan 237 (THP-237), by which it proposes to log trees in Owl Creek, encompasses a 237-acre, kidney-shaped segment of its forest land. Because of the large size of Owl Creek's old-growth redwood and Douglas fir trees, the high degree of canopy closure, the existence of suitable nest platforms, and its proximity to the ocean, Owl Creek, including the area within Pacific Lumber's proposed THP-237, is suitable nesting habitat for the marbled murrelet.
 
 
 8
 On April 11, 1990, Pacific Lumber submitted THP-237 to the California Department of Forestry and Fire Protection (CDF) for approval. The CDF refused to approve the logging plan because it did not provide sufficient mitigation measures to prevent a "take" of the marbled murrelet, in violation of the California Endangered Species Act (CESA). Nearly two years later, on March 13, 1992, the California Board of Forestry overruled the CDF and conditionally approved Pacific Lumber's THP-237. This approval was contingent on Pacific Lumber conducting marbled murrelet surveys in Owl Creek in compliance with the Pacific Seabird Group's "Methods for surveying Marbled Murrelets at Inland Forested Sites" (PSG Protocol),[2] and Pacific Lumber sharing its survey results with the California Department of Fish and Game (CDFG), to ensure that no "take" of marbled murrelets would occur.
 
 
 9
 Pacific Lumber conducted surveys sporadically for the next three years. The surveys were not conducted in compliance with the PSG Protocol. The district court found the surveys were conducted in such a way as to avoid detection of marbled murrelets, and to understate the numbers of those murrelets which were detected. Despite this, over one hundred detections were made including many instances of "occupied behavior."[3]
 
 
 10
 Twice in 1992, Pacific Lumber surreptitiously conducted logging operations in Owl Creek. The first instance was in June, 1992. Before the CDFG received notice, Pacific Lumber commenced logging on a Friday and continued over the weekend. When the CDF became aware of this logging, the CDF asked Pacific Lumber to stop and it did. During the logging, however, Pacific Lumber had harvested areas immediately adjacent to murrelet survey stations where several detections had been recorded.
 
 
 11
 The second surreptitious logging occurred over the Thanksgiving holiday weekend in 1992, despite repeated warnings by the United States Fish and Wildlife Service (USFWS) in October and November that logging in Owl Creek would likely cause a "take" of marbled murrelets in violation of the ESA.
 
 
 12
 The complaint in this case was filed on April 16, 1993, as a citizen suit under section 11 of the ESA, 16 U.S.C. § 1540(g). The trial lasted from August 15 to September 8, 1994. On February 27, 1995, the district court entered its memorandum order including findings of fact and conclusions of law. In this order, the court concluded that implementation of Pacific Lumber's proposed THP-237 would both "harass" and "harm" marbled murrelets and thereby cause a "take" in violation of the ESA.[4] Judgment was entered on June 20, 1995, which enjoined the implementation of THP-237 and awarded $1,110,344.29 to EPIC in attorney fees. This appeal followed.
 
 II
 DISCUSSION
 A. Waiver
 
 13
 The first issue we consider is whether Pacific Lumber has waived its right to argue in this appeal that evidence of a threat of future harm, as opposed to evidence of past actual harm, is legally insufficient for the issuance of the district court's injunction. Pacific Lumber did not raise this argument in the district court.
 
 
 14
 As a general rule, we will not consider an issue raised for the first time on appeal. Bolker v. Commissioner, 760 F.2d 1039, 1042 (9th Cir.1985). There are three exceptions to this rule. We have discretion to consider an issue raised for the first time on appeal: (1) to prevent a miscarriage of justice or to preserve the integrity of the judicial process; (2) to decide an issue when there has been an intervening change in the law; or (3) to decide an issue which is purely one of law and does not depend on an inadequately developed factual record. Id.
 
 
 15
 The only exception which could apply in this case is the second. If Pacific Lumber's interpretation of Sweet Home is correct, this recent Supreme Court decision would be an intervening change in the law. We cannot decide whether Pacific Lumber's interpretation of Sweet Home is correct without considering the issue it raises. Accordingly, we exercise our discretion to review the merits of Pacific Lumber's argument that Sweet Home compels the conclusion that evidence of a threat of future harm, as opposed to evidence of past actual harm, is legally insufficient for the issuance of the district court's injunction.
 
 B. Threat of Future Harm
 
 16
 Pacific Lumber argues the district court had no authority to issue the injunction because the ESA permits an injunction only when a person "is alleged to be in violation of any provision" of the Act, 16 U.S.C. § 1540(g)(1)(A), meaning, according to Pacific Lumber, that the harm must have already occurred. Pacific Lumber contends this conclusion is compelled by the Court's holding in Sweet Home, which decision, it argues, nullified our opinion in Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781 (9th Cir.1995). We disagree.
 
 
 17
 The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of endangered species and threatened species." 16 U.S.C. § 1531(b). To help achieve this purpose the ESA authorizes citizen suits "to enjoin any person ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof...." 16 U.S.C. § 1540(g)(1)(A).
 
 
 18
 Section 1538(a)(1)(B) of the ESA makes it a violation of the Act for anyone to "take" an endangered species. "Threatened" species are also protected by this provision. 50 C.F.R. § 17.31(a). The term "take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Secretary of the Interior (Secretary) defines "harass" and "harm" as follows:
 
 
 19
 Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering.
 
 
 20
 Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.
 
 
 21
 50 C.F.R. § 17.3.
 
 
 22
 In this circuit, we have repeatedly held that an imminent threat of future harm is sufficient for the issuance of an injunction under the ESA. See e.g. Rosboro, 50 F.3d at 783; National Wildlife Fed'n v. Burlington North. R.R., 23 F.3d 1508, 1511 (9th Cir.1994); Palila v. Hawaii Dept. of Land and Natural Resources, 852 F.2d 1106, 1108 (9th Cir.1988) (Palila II ).
 
 
 23
 In Rosboro, decided three months before the Supreme Court's decision in Sweet Home, an environmental group filed a citizen suit under the ESA seeking an injunction to prevent proposed logging which would impact the habitat of two spotted owls. Rosboro, 50 F.3d at 783. The district court granted summary judgment in favor of the defendant Rosboro Lumber concluding the ESA requires a plaintiff to show either a past or current injury to a protected species. Id. We reversed, holding:
 
 
 24
 The district court's construction is antithetical to the basic purpose of the ESA to protect endangered and threatened species and prevent their further decline. The language and legislative history of the ESA, as well as applicable case law support our holding today that a showing of a future injury to an endangered or threatened species is actionable under the ESA.
 
 
 25
 Id.
 
 
 26
 This holding in Rosboro was not nullified by Sweet Home. In Sweet Home, parties dependent on the forest product industry brought an action for declaratory relief against the Secretary and the USFWS, facially challenging the Secretary's definition of "harm." --- U.S. at ----, 115 S.Ct. at 2410. The plaintiffs argued that Congress did not intend the word "take" to include habitat modification as the Secretary's "harm" definition provided. Id.
 
 
 27
 The Supreme Court determined that the text of the Act provided three reasons for concluding the Secretary's interpretation was reasonable. Id. at ----, 115 S.Ct. at 2412. First, the ordinary understanding of the word "harm" supports an interpretation that does not require an act of direct violence to an animal. An indirect cause, such as habitat modification, also comes within the meaning of "harm" in the statute. Id. at ----, 115 S.Ct. at 2412-13. Second, the broad purpose of the ESA supports the extension of protection to include habitat modification. Id. at ----, 115 S.Ct. at 2413-14. Third, the permit system set up by the 1982 amendment to the ESA strongly suggests Congress understood the ESA to prohibit indirect as well as deliberate takings. Id. at ----, 115 S.Ct. at 2414.
 
 
 28
 Pacific Lumber relies on a footnote in the Sweet Home opinion in which the Court notes that the "harm" regulation was promulgated in 1975 and then amended in 1981 "to emphasize that actual death or injury of a protected animal is necessary for a violation." --- U.S. at ---- n. 2, 115 S.Ct. at 2410 n. 2. Pacific Lumber contends this footnote means injunctive relief is allowed only against someone who has already violated the Act. We disagree. Nothing in the Court's footnote 2 purports to limit injunctive relief under the ESA to past violations. The Secretary amended the "harm" regulation to prevent a finding of harm from habitat modification alone, without any attendant harm to a protected species. As we explained in Rosboro:
 
 
 29
 because the Secretary was concerned that the old definition of "harm" could be read to mean habitat modification alone, the Secretary inserted the phrase "actually kills or injures wildlife" to preclude claims that only involve habitat modification without any attendant requirement of death or injury to protected wildlife. 46 Fed.Reg. 54748-49 (1981).
 
 
 30
 Nowhere does the re-definition of "harm" or its explanatory commentary require historic injury to protected wildlife.
 
 
 31
 50 F.3d at 784 (emphasis in original).
 
 
 32
 Pacific Lumber also relies on a passage in Sweet Home in which the Court stated:
 
 
 33
 Respondents' argument that the Government lacks any incentive to purchase land under § 5 when it can simply prohibit takings under § 9 ignores the practical considerations that attend enforcement of the ESA. Purchasing habitat lands may well cost the Government less in many circumstances than pursuing civil or criminal penalties. In addition, the § 5 procedure allows for protection of habitat before the seller's activity has harmed any endangered animal, whereas the Government cannot enforce the § 9 prohibition until an animal has actually been killed or injured.
 
 
 34
 Sweet Home, --- U.S. at ----, 115 S.Ct. at 2415 (emphasis added). Relying on this language, Pacific Lumber argues no injunction may issue until the death or injury of a protected species has actually occurred. We reject this argument.
 
 
 35
 The facts of Sweet Home did not require the Court to address the question whether a showing of a threat of future harm is sufficient for an injunction. The case involved a facial challenge to the Secretary's definition of "harm." To the extent the Sweet Home opinion may be read to say past injury is required before an injunction may issue, such a statement is dictum.
 
 
 36
 Furthermore, the remainder of the Sweet Home opinion indicates that the Court did not intend to alter case law which held that an injunction may issue upon a showing of a threat of imminent harm. The Court explicitly found the Secretary's interpretation of the law reasonable. Id. at ----, 115 S.Ct. at 2416. The Court paraphrased the Secretary's view that "the § 9 prohibition on takings, which Congress defined to include 'harm,' places on respondents a duty to avoid harm that habitat alteration will cause the birds unless respondents first obtain a permit." Id. at ----, 115 S.Ct. at 2412 (emphasis added). By finding this view reasonable, the Court approved an interpretation of the ESA which prevents activity that will cause future harm. This was our interpretation in Rosboro.
 
 
 37
 In a more recent opinion, we cited both Rosboro and Sweet Home as support for the proposition that the citizen suit provision of the ESA "allows private plaintiffs ... to enjoin private activities that are reasonably certain to harm a protected species." Sierra Club v. Babbitt, 65 F.3d 1502, 1512 (9th Cir.1995); see also Loggerhead Turtle v. County Council of Volusia, 896 F.Supp. 1170, 1179-80 (D.Fla.1995).
 
 
 38
 We conclude that the Supreme Court's decision in Sweet Home does not overrule Rosboro. A reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under section 9 of the ESA. Rosboro, 50 F.3d at 786; Burlington North. R.R., 23 F.3d at 1511; American Bald Eagle v. Bhatti, 9 F.3d 163, 166 (1st Cir.1993).
 
 C. Sufficiency of the Evidence
 
 39
 Pacific Lumber bases its challenge to the sufficiency of the evidence on several arguments. Its principal argument is that the evidence fails to meet the standard for reliable scientific evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
 
 
 40
 1. The Daubert challenge.
 
 
 41
 In Daubert, the Supreme Court made clear that the Federal Rules of Evidence, specifically Rule 702, not Frye v. United States, 293 F. 1013 (D.C.Cir.1923), governs the admissibility of expert scientific evidence. 509 U.S. at 597-99, 113 S.Ct. at 2799. The appropriate test of admissibility depends on the trial court's determination of a reliable foundation and relevance to the issues at trial. "Pertinent evidence based on scientifically valid principles will satisfy those demands." Id.
 
 
 42
 Daubert supplies a test for admissibility of scientific evidence. 509 U.S. at 582, 113 S.Ct. at 2791 ("In this case we are called upon to determine the standard for admitting expert scientific testimony in a federal trial."). Pacific Lumber's Daubert challenge, however, is raised in the context of an insufficiency-of-the-evidence argument, not a challenge to the admission of the evidence. In Pacific Lumber's view, whether admitted at trial or not, EPIC's scientific evidence of impaired breeding of marbled murrelets fails the Daubert test because it is irrelevant and unreliable, and therefore is insufficient to support the district court's judgment.
 
 
 43
 Although we recognize that evidence which is unreliable is necessarily insufficient, the appropriate time to raise Daubert challenges is at trial. By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal. Fenton v. Freedman, 748 F.2d 1358, 1360 (9th Cir.1984); Dale Benz, Inc., Contractors v. American Cas. Co., 305 F.2d 641, 643 (9th Cir.1962). The rationale behind this rule applies to Pacific Lumber's Daubert argument in this appeal, even though it couches its argument in terms of insufficiency of the evidence, because its insufficiency argument is identical to the admissibility objection which it waived.
 
 
 44
 Pacific Lumber raised its Daubert objections in the district court in its pretrial "Objections To Evidence," filed June 27, 1994. The district court, however, did not rule on these objections and Pacific Lumber did not request a ruling. This is clear from Pacific Lumber's failure to state in its briefs on appeal where in the record it requested, or the trial court made, any ruling on the Daubert objections. See, Circuit Rule 28-2.5. Nor has Pacific Lumber provided as part of the excerpt of record in this appeal the "portion of the reporter's transcript recording any discussion by court or counsel involving" the challenge to admissibility of EPIC's scientific evidence. See, Circuit Rule 30-1.3(a)(vii).
 
 
 45
 By failing to request a ruling in the district court on its Daubert objections, Pacific Lumber evaded that court's decision of the issue, and denied EPIC the opportunity to lay a better foundation for the evidence. See Fenton, 748 F.2d at 1360. In this circumstance, permitting Pacific Lumber to challenge on appeal the reliability of EPIC's scientific evidence under Daubert, in the guise of an insufficiency-of-the-evidence argument, would give Pacific Lumber an unfair advantage. Pacific Lumber would be "free to gamble on a favorable judgment before the trial court, knowing that [it could] seek reversal on appeal because of [its] failure to obtain a ruling on [its] objections." Id. We will not permit this.
 
 
 46
 We conclude Pacific Lumber waived its Daubert objections to EPIC's scientific evidence of impaired breeding by failing to request a ruling on the admissibility of the evidence in the district court.
 
 
 47
 2. Whether impaired breeding is "harm."
 
 
 48
 Pacific Lumber next argues that even if EPIC's scientific evidence of impaired breeding is considered, impaired breeding is not "harm" to an actual bird, but rather is harm to the population and therefore is legally insufficient to qualify as "harm" under the ESA, 16 U.S.C. § 1532(19). Pacific Lumber relies on Sweet Home for this argument.
 
 
 49
 Neither the majority nor the concurring opinion in Sweet Home provides any support for Pacific Lumber's argument. The majority opinion did not address whether impaired breeding amounts to harm to the species impaired or whether it harms only the general population. The majority avoided the question. See --- U.S. at ---- n. 13, 115 S.Ct. at 2414 n. 13. The dissent in Sweet Home believed the Secretary's "harm" regulation was too broad because it included impaired breeding as harm when, in the dissent's view, impaired breeding was harm to a population of animals and not to an actual animal as required by statute. Id. at ----, 115 S.Ct. at 2430 (Scalia, J., dissenting).
 
 
 50
 In her concurrence, Justice O'Connor disagreed with the dissent, arguing it was difficult to dismiss the notion that "significant impairment of breeding injures living creatures." Id. at ----, 115 S.Ct. at 2419 (O'Connor, J., concurring). Noting that the dictionary definition of "injure" includes "impair," Justice O'Connor stated that at least complete impairment of breeding would be injury to the living creature so impaired. The concurrence concluded:
 
 
 51
 In any event, even if impairing an animal's ability to breed were not, in and of itself, an injury to that animal, interference with breeding can cause an animal to suffer other, perhaps more obvious, kinds of injury.
 
 
 52
 Id. (emphasis in original).
 
 
 53
 Most importantly, however, the majority in Sweet Home upheld the facial validity of the Secretary's "harm" regulation. That regulation defines harm to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Thus, under Sweet Home, a habitat modification which significantly impairs the breeding and sheltering of a protected species amounts to "harm" under the ESA. Accord Rosboro, 50 F.3d at 788. "Harm" under the ESA, therefore, includes the threat of future harm. Id. We next consider whether there was sufficient evidence of a threat of future harm.
 
 
 54
 3. Sufficiency of the evidence of future harm.
 
 
 55
 Evidence was presented in the district court that there were "approximately 100 detections of marbled murrelets at Owl Creek, throughout the birds' breeding season, for a period of three consecutive years," including many instances of "occupied behavior." Evidence of occupied nesting behavior was also provided by the PSG Protocol. In addition, several experts testified to the probability of the murrelets' nesting in Owl Creek, and that implementation of Pacific Lumber's harvesting plan would likely harm marbled murrelets by impairing their breeding and increasing the likelihood of attack by predators on the adult murrelets as well as the young.
 
 
 56
 We conclude there was sufficient evidence to support the district court's findings. The district court did not clearly err in finding marbled murrelets were nesting in Owl Creek and that there was a reasonable certainty of imminent harm to them from Pacific Lumber's intended logging operation.[5]
 
 III
 CONCLUSION
 
 57
 In Rosboro, we held a reasonably certain threat of future harm is sufficient to support a permanent injunction under the ESA. Rosboro, 50 F.3d at 783. The Supreme Court's decision in Sweet Home does not affect the vitality of that holding. Rosboro remains good law.
 
 
 58
 Pacific Lumber's attack on the sufficiency of the evidence to support the district court's findings and judgment hinges largely upon its assertion that EPIC's scientific evidence of impaired breeding did not comply with the scientific reliability requirement of Daubert. Pacific Lumber is precluded from raising this argument on appeal, because it failed to request a ruling on its Daubert objections to admissibility of the evidence in the district court. The evidence is sufficient to support the district court's findings and judgment.
 
 
 59
 AFFIRMED.
 
 
 
 *
 Honorable Stephen V. Wilson, District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The Cities of Fortuna, Eureka, and Rio Dell, and the Pacific Legal Foundation have moved to file an amici curiae brief in support of Pacific Lumber. This motion was filed late and there was no attempt to show good cause for the late filing. The motion is denied. See Fed. R.App. P. 29
 
 
 [2]
 The Pacific Seabird Group is a professional scientific organization which has taken the lead role in coordinating and promoting research on marbled murrelets, and in providing researchers and land managers with standardized techniques to determine marbled murrelet use of inland forested sites
 
 
 [3]
 According to the PSG Protocol, "occupied behavior" is behavior that has been observed in stands with evidence of nesting. The PSG Protocol finds instances of "occupied behavior" to be a strong indication that murrelets are using the stand to nest
 
 
 [4]
 THP-237, as modified, contemplates a 137-acre harvest area in which 40% to 60% of the trees would be harvested
 
 
 [5]
 We need not consider the sufficiency of the evidence to support the district court's finding that implementation of Pacific Lumber's THP-237 would "harass" the marbled murrelets. The district court's finding of "harm" under the ESA is sufficient to support its injunction without a finding of harassment