**ARIZONA CATTLE GROWERS' ASSOC., an Arizona non-profit association, and Jeff Menges, Plaintiffs,**

v.

**U.S. FISH AND WILDLIFE SERVICE and Bureau of Land Management, Defendants.**

**No. CV9702416 PHX–SMM (DAE).**

United States District Court,
D. Arizona.

Dec. 10, 1998.

Norman D. James, Jay Lawrence Shapiro, Fennemore Craig, Phoenix, AZ, for Arizona Cattle Growers' Association, an Arizona nonprofit association, plaintiff.

Michael R. Arkfeld, U.S. Attorney's Office, Phoenix, AZ, Christiana P. Perry, U.S. Department of Justice, Washington, DC, Andrea L. Berlowe, U.S. Department of Justice, Environment & Natural Resources Div, Washington, DC, Samuel D Rauch, III, U.S. Department of Justice, Environment & Natural Resources Div., Washington, DC, Kenneth E. Kellner, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Fish and Wildlife Service, defendant.

*ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT*

EZRA, Chief Judge.

The court heard Plaintiffs' Motion and Defendants' Cross–Motion on October 21,

1998. Norman D. James, Esq., and Jay L. Shapiro, Esq., appeared at the hearing on behalf of Plaintiffs; Assistant United States Attorney Samuel D. Rauch, III, appeared at the hearing on behalf of Defendants. After reviewing the motions and the supporting and opposing memoranda, the court GRANTS Plaintiffs' Motion for Partial Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

## BACKGROUND

On September 26, 1997, Defendant United States Fish and Wildlife Service ("FWS") issued the Programmatic Biological Opinion for the Safford and Tucson Field Offices' Livestock Grazing Program, Southeastern Arizona (the "BO"). In the BO, the FWS included "incidental take statements," which are issued to government agencies in order to preserve land for endangered species, by specifying conditions for the land's use. Plaintiffs Arizona Cattle Growers' Association ("ACGA") and Jeff Menges ("Menges"; together, "Plaintiffs") bring this action against the Defendants Bureau of Land Management ("BLM") and FWS (together, "Defendants"), alleging six separate causes of action relating to economic harms they claim will be suffered as a result of the ITS's.

Under the power granted to it by the Endangered Species Act ("ESA"), the FWS may carry out "programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1) (1985). As part of this task, the FWS issues BO's that contain "incidental take statements" ("ITS"). ITS identify areas where members of particular species are at risk and then issue advisory opinions to the appropriate government agency. If the agency adopts the BO, it will then implement the terms and conditions of the ITS that limit or monitor the use of land. In so doing, the agency immunizes itself and its applicants from penalties for takings under § 9 of ESA. Thus, users of

the land are permitted to "take" members of the listed species, notwithstanding the prohibition against taking contained in 16 U.S.C. § 1538, but these takings must occur within the guidelines established by the incidental take statements.

At present, there are some 288 grazing allotments on public lands administered by BLM in southeastern Arizona. Together, these allotments total nearly 1.6 million acres of land, most of which is allocated for ranching operations. Pursuant to 43 U.S.C. § 315 (1986), the Secretary of Interior identifies areas that are valuable primarily for grazing, and the land is set aside for that purpose. Landowners in the region are then awarded grazing permits to use the land, and the Secretary of Interior is charged with "safeguarding" these grazing preferences on that land.

In this case, the FWS concluded in the BO that livestock grazing in the affected Bureau administered land was not likely to jeopardize the continued existence of listed species under the ESA, including the Cactus Ferruginous Pygmy Owl and the Razorback Sucker. Nevertheless, the FWS issued ITS to the BLM for each of these species, explaining that even if grazing would not put the species at risk of extinction, it would "take" members of the species and thus grazing should be monitored. The FWS issued the following terms and conditions to control the "taking" of the listed species:

> No grazing of cattle shall occur on Bureau-administered lands in the 100–floodplain of the Gila River, and the riparian corridors of Bonita Creek and the San Francisco River through the project area for the life of the project (through December 31, 2006). Actions shall be taken, including fencing, monitoring for and removal of trespass cattle, and other measures to ensure grazing does not occur on these lands.

ARVI–42, at 175.

Plaintiffs ACGA and Jeff Menges ("Menges") claim that the incidental take

statements issued by the FWS will cause severe economic losses to ranchers in southeastern Arizona. ACGA is a non-profit corporation with 850 members and its principal office located in the State of Arizona. The organization was formed in 1904 to represent the interests of Arizona's ranching industry. Plaintiff Menges is the owner and operator of the Menges Ranch, a cattle ranch located southeast of Clifton, Arizona. Menges's ranch contains approximately 135 acres of private land owned by Menges, and approximately 220 acres of land owned by a private corporation. The remaining 40 sections of his ranch are public lands administered by the BLM. Menges also owns permits issued by BLM authorizing him to use two additional allotments for cattle grazing. Together, Plaintiffs bring this suit to challenge the ITS contained in the BO. Ultimately, Plaintiffs claim the terms of the ITS will reduce and even eliminate livestock grazing in various parts of southeastern Arizona, causing substantial harm to the communities and citizens in the area who are dependent on the ranching industry. Plaintiffs bring this suit against Defendants, seeking injunctive and declaratory relief on the basis of six counts:

1. The FWS acted arbitrarily and capriciously in issuing the ITS because it applied an Overbroad and Unlawful Definition of "Take" in the Incidental Take Statements;

2. The FWS acted arbitrarily and capriciously in issuing the ITS because it Failed to Specify the Amount or Extent of the Anticipated Take and Provided no Clear Standard for Determining When the Authorized Level of Take is Exceeded;

3. The Reasonable and Prudent Measures and Mandatory Terms and Conditions Unlawfully Modify the Basic Design, Scope, Timing and Duration of the Action;

4. The Reasonable and Prudent Measures and Mandatory Terms and Conditions Contain Requirements that Cannot be Satisfied;

5. FWS Failed to Utilize the Best Scientific and Commercial Information in Developing the Incidental Take Statements ("ITS");

6. FWS Failed to Comply with NEPA in Issuing the Incidental Take Statements.

Pursuant to this court's Order issued concurrently with this Order, Count VI has been dismissed for lack of standing. With respect to the remaining counts, Plaintiffs have filed the instant Motion for Partial Summary Judgment, relating to Counts One, Two and Three. Defendants have filed a Cross–Motion for Summary Judgment.

*STANDARD OF REVIEW*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the nonmoving party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. *But cf., id.,* at 328, 106 S.Ct. 2548 (White, J., concurring).

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See T.W. Elec.,* 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (original emphasis).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg,* 815 F.2d at 1289.

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631. Also, inferences from the facts must be drawn in the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the nonmoving party. *Id.*

## DISCUSSION

Plaintiffs seek summary judgment on two grounds. First, they claim that the FWS's determinations that livestock grazing will "take" members of the listed species are arbitrary and capricious, or otherwise not in accordance with the ESA, because they apply an overbroad and unlawful definition of "take." Second, Plaintiffs claim that the ITS issued by the FWS do not comply with the requirements set forth in the FWS's regulation. 50 C.F.R. § 402.14. In response, the Defendants seek summary judgment on three grounds: 1) Plaintiffs have standing to challenge only the Zorilla and Smugglers Peak provisions in the ITS; 2) the Zorilla and Smuggler Peak provisions satisfy the regulatory requirements; and 3) the terms and conditions specified by the ITS are reasonable. The court first addresses the threshold issue of standing, and then turns to an analysis of the validity of the ITS.

## I. *Standing*

■ Under Article III of the Constitution, a party must meet three standing requirements: "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a

favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted); *see also San Diego County Gun Rights Committee v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996). In addition to the constitutional requirements of standing, plaintiff's claims must be within the "zone of interests" sought to be protected by the statute in question. *Nevada Land Action Assoc. v. United States Forest Service,* 8 F.3d 713, 716 (9th Cir.1993).

Defendants contend that Plaintiffs have standing to challenge the ITS only as they apply to the Zorilla and Smuggler's Peak allotments.[1] Defendants argue that the only particularized allegations of an "injury in fact" are those put forth by Jeff Menges, as they relate to these two allotments, and Plaintiffs thus do not have standing to challenge the application of the ITS to the remaining allotments of land.

Plaintiffs respond that ACGA has "representational standing" to challenge the remaining allotments, because many of its members have been "directly affected by the incidental take statements" with respect to these allotments, and ACGA is representing their interests in the instant action. Declaration of C.B. "Doc" Lane Regarding Standing at ¶ 9. "The modern doctrine of associational [or representational] standing, [allows] an organization ... to redress its members' injuries, even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). "While the possibility of such Representational Standing ... does not eliminate or attenuate the constitutional requirement of a case or controversy, ... under certain circumstances, injury to an organization's members will satisfy Article III and allow that

organization to litigate in federal court on their behalf." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (internal citations and quotation marks omitted).

Here, Plaintiffs bring their claim pursuant to the Administrative Procedure Act, which provides a private right of action to challenge action under the ESA. The APA confers standing on any party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (1996). Thus, for purposes of the APA, the issue of standing focuses on the harm suffered as a result of the agency action as a whole. In this case, Plaintiffs challenge two incidental take statements contained in the Biological Opinion for the Safford/Tucson Field Offices' Livestock Grazing Program. The relevant standing question is not whether Plaintiffs have standing to sue with respect to each of the affected allotments, but rather, whether they have standing to sue with respect to the ITS.

Admittedly, Plaintiffs must allege some actual injury stemming from the application of the ITS on the land in question, but this they have indisputably done. Menges's declaration sets out harms he will suffer if the ITS are implemented. This is not like *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 887, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), where the plaintiffs lacked standing because they made only bare allegations of harm to land "in the vicinity" of the affected area. Rather, in this case, Plaintiffs allege harm with respect to the precise area affected by the ITS.

The Ninth Circuit addressed a similar situation in *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346 (9th Cir. 1994). In *Robertson,* a citizens group challenged an environmental impact statement that allowed the use of herbicides as part of a reforestation program. The affected

---

1. Defendants concede that both Jeff Menges and ACGA, as Plaintiffs, have standing to challenge the ITS. The sole basis for Defendants' standing claim relates to Plaintiffs' standing to challenge the application of the ITS beyond the two identified allotments of land.

lands were located in Northern California and the Sierra Nevada, and totaled "approximately six million of the total twenty million acres of National Forest System land in the Region." *Robertson*, 32 F.3d at 1349. In concluding that the group had representational standing to sue on behalf of its members, the Ninth Circuit relied primarily on two affidavits submitted by members of the citizens group, who alleged injury to their recreational use of the land. While the issue was not directly before the court, the Ninth Circuit did find that the affidavits were sufficient to confer standing on the organization with respect to the entire region, despite the fact that the affiants obviously could not claim injury relating to the entire six million acres of land. The court simply noted that "SRCC members live adjacent to or within the boundaries of Region 5. Also, individual members state that they visit several of the national forests in Region 5 routinely." *Robertson*, 32 F.3d at 1353. Thus, visits to "several of the national forests" were sufficient to confer standing to sue with respect to the entire six million acre region.

Similar to the claims by the citizens group in *Robertson*, ACGA alleges harms suffered by its members as a result of the application of the ITS in the entire affected region. In addition to Jeff Menges' declaration, Exhibit A to the declaration of C.B. "Doc" Lane identifies several members who will be affected by the application of the ITS to other affected allotments. Thus, Plaintiffs have alleged harm from the application of the ITS with respect to the affected area. Where Plaintiffs seek to invalidate an entire administrative mandate, more particularized harm than is shown in this case is unnecessary. Accordingly, if ACGA can establish representational standing, it may bring suit on the basis of harms relating to the application of the ITS as a whole.

■ To establish representational standing, ACGA must demonstrate the following: 1) that its members have standing on their own to bring the instant action; 2)

that the interests the organization seeks to protect are germane to its purpose; and 3) that neither the claim asserted nor the relief requested requires individual participation by its members. *Brown Group*, 517 U.S. at 552, 116 S.Ct. 1529 (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1352 n. 10 (9th Cir.1994).

■ The first factor for representational standing simply requires that "at least one of the organization's members would have standing to sue on his own." *Brown Group*, 517 U.S. at 554, 116 S.Ct. 1529. Defendants do not dispute that Jeff Menges, also a member of ACGA, has standing to bring the instant action. In addition, Plaintiffs state that ACGA has 850 members, and that many of these members hold grazing preferences, permits and leases authorizing cattle grazing on the BLM land in question. Finally, throughout their pleadings, Plaintiffs allege that the ITS will impose severe limitations on the availability of land for cattle grazing on the selected grazing allotments. Specifically, Plaintiffs contend:

Members of the ACGA as well as Mr. Menges are being, or will be, injured by the incidental take statements challenged herein due to the reasonable and prudent measures and mandatory terms and conditions contained in those statements. These reasonable and prudent measures and mandatory terms and conditions would significantly reduce and, in some cases, require the elimination of livestock grazing on allotments in southeastern Arizona in derogation of the rights and privileges of ranchers holding grazing preferences established under federal laws.... The FWS's incidental take statements are likely to result in the termination of ranching operations in southeastern Arizona thereby causing irreparable injury to rural communities and counties whose citizens are dependent on ranching and related activities.

Complaint at ¶ 6. In addition, Plaintiffs provided a list of affected parties with respect to particular allotments of land. Thus, Plaintiffs provide support for their claim that many of ACGA's members "are directly affected by the incidental take statements." Based on the allegations in the Complaint and the pleadings, ACGA's members clearly have standing on their own to bring the instant action with respect to the entire land area affected by the ITS.

The second factor requires that the interests protected by ACGA are "germane to its purpose." *Associated Gen'l Contractors of Am. v. Metropolitan Water Dist. of S. Calif.*, 159 F.3d 1178 (9th Cir.1998). Plaintiffs allege in the Complaint that ACGA "was formed in 1904 to provide a unified voice on issues affecting the ranching industry in Arizona." Complaint at ¶ 4. Thus, their stated purpose clearly encompasses the interests sought to be vindicated in the present case.

Finally, the third prong of the test requires that "neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." *Brown Group*, 517 U.S. at 553, 116 S.Ct. 1529. In general, cases for injunctive or declaratory relief do not require individualized proof from particular members of the organization. *See, e.g., Brown Group*, 517 U.S. at 553–54, 116 S.Ct. 1529 (noting that a union's claim of representational standing on behalf of its members could not be sustained where it sought monetary relief); *Associated Gen'l Contractors*, 159 F.3d at 1180 (concluding that "[i]ndividualized proof is not needed where ... declaratory and injunctive relief is sought rather than monetary damages"). In cases for injunctive or declaratory relief, the interests of individual members are not likely to be "peculiar to the individual member concerned," so as to require individualized proof. *Lake Mohave Boat Owners Assoc. v. Nat'l Park Serv.*, 78 F.3d 1360, 1367 (9th Cir.1995). Here, Plaintiffs seek only injunctive and declaratory relief

from the ITS contained in the BO, and there are no individual claims for damages requiring individualized proof. Thus, participation from individual members of the organization is not necessary.

Accordingly, because ACGA has representational standing to sue on behalf of its members who are "directly affected by the incidental take statements," the court concludes that Plaintiffs have standing to sue for injuries relating to all allotments affected by the ITS. Accordingly, Defendants' Motion for Partial Summary Judgment for lack of standing is DENIED.

II.  *Arbitrariness and Capriciousness Under the Administrative Procedure Act*

██  The Administrative Procedure Act ("APA") allows a court to "set aside agency action, findings, conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. The standard is a deferential one, and the court will evaluate only "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir.1998). Despite this deferential standard, however, the Supreme Court has noted that courts "should not automatically defer" to an agency's determination "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Thus, in analyzing whether the FWS applied an overbroad definition of "harm" to justify the ITS, the court gives deference to the FWS, but does not simply "rubber stamp" its decision.

Under Section 9 of the ESA, it is unlawful for any person subject to the jurisdiction of the United States to "take" any endangered species within the territory of the United States. 16 U.S.C.

§ 1538(a)(1)(B) (1985). Pursuant to this mandate, the FWS may issue BO's that contain ITS's designed to prevent the "taking" of endangered species. Section 3(19) of the ESA defines the term "take" as "to harass harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (1985). The statute does not itself expound on the term; however, it is clarified in the Interior Department regulations that implement the statute. There, the term "harm" is defined:

> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation *where it actually kills or injures wildlife* by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1994) (emphasis added).

■ In the present case, Defendants issued ITS premised on the existence of listed endangered species in the affected grazing allotments and the subsequent "harm" that would be suffered by the listed species if grazing were not curtailed. In support of their claim that overgrazing and other activities will result in harm to the listed species, Defendants make general statements about the "possibility" or "likelihood" that members of the listed species exist. For example, Defendants state that "it is likely that small or very small numbers of the released razorback suckers survived in the ... project area", but admit that "[n]o razorback suckers were found during preliminary surveys of the [area] in 1991." Moreover, the FWS concedes that there is "an apparent scarcity of razorback suckers in the project area," and that "the last reported sighting of a razorback sucker in the Safford District occurred in 1991." ARV1–42 at 166. Defendants admit that surveys also were conducted for pygmy-owls in 1997 in sections along various parts of the Gila River, and "[n]o pygmy-owls were detected during these surveys." BO at 224.

Conceding the lack of evidence indicating the existence of the listed species in the project area, the FWS argues that harm may be demonstrated by focusing on habitat modification. The FWS states that it "anticipates that take associated with the proposed project would occur in the form of harm due to *significant habitat modification or degradation* on these lands." ARV1–42 at 230 (emphasis added).

Defendants' argument is inadequate to demonstrate the requisite harm to constitute a taking. The language of the regulation states that "harm" includes habitat modification or degradation only if it results in actual injury or death to wildlife. The Supreme Court recently reiterated the importance of actual death or injury in the definition of "harm." *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 695 n. 9, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). In *Sweet Home*, the Court addressed whether habitat modification can constitute "harm" within the meaning of the Regulation. The Court held that a "take" could include habitat modification, but noted that "the Secretary's definition of 'harm' is limited to 'act[s] which actually kil[l] or injur[e] wildlife.' ") *Sweet Home*, 515 U.S. at 696 n. 9, 115 S.Ct. 2407 (citing 50 C.F.R. § 17.3 (1994)). Thus, the Court concluded that the modification or degradation of habitat can constitute "harm," and by extension a "take," but only if there is evidence that the habitat modification will result in actual injury or death to wildlife. If Defendants are unable to provide evidence indicating that the listed species even exist on the allotments at issue, they certainly cannot show that the habitat modification they speak of will "actually kil[l] or injur[e] wildlife." 50 C.F.R. § 17.3 (1994).

Defendants make several attempts to defend this lack of proof. First, Defendants deny that *Sweet Home* requires actual injury or death to constitute harm for purposes of an ITS. They rely on a Ninth Circuit case, *Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir.1996), *cert. denied,*

519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997), to argue that the Supreme Court's reasoning in *Sweet Home* was dictum. They further cite two unreported cases from the District of Oregon, both of which found sufficient "harm" where there was no conclusive evidence of the existence of endangered species. *Boise–Cascade Corp. v. Spear,* Civil No. 97–1810–JO (D.Or. April 1, 1998); *United States v. West Coast Forest Resources,* Civil No. 96–1575–HO (D.Or. August 4, 1997).

Defendants' reliance on these cases is misplaced. In *Babbitt,* the Ninth Circuit did not reject as dictum the Supreme Court's determination that "harm" requires actual injury or death. Rather, the court stated that "[t]o the extent the *Sweet Home* opinion may be read to say past injury is required before an injunction may issue, such a statement is dictum." *Babbitt,* 83 F.3d at 1065. In fact, the Ninth Circuit in *Babbitt* specifically excluded habitat modification as a legitimate basis for a finding of "harm":

> [B]ecause the Secretary was concerned that the old definition of "harm" could be read to mean habitat modification alone, the Secretary inserted the phrase "actually kills or injures wildlife" to preclude claims that only involve habitat modification without any attendant requirement of death or injury to protected wildlife.

83 F.3d at 1065 (citing *Forest Conservation Council v. Rosboro Lumber,* 50 F.3d 781 (9th Cir.1995)). Thus, *Babbitt* questioned only the Supreme Court's determination that past injury must be shown to issue an injunction; it did nothing to challenge the Supreme Court's determination in *Sweet Home* that "harm" requires actual injury or death to wildlife.

Defendants' reliance on *Boise–Cascade* and *West Coast Forest* is similarly problematic. In each of these cases, the courts issued preliminary injunctions to enjoin clear-cutting until the court could ascertain whether members of the listed species actually existed on the land. The courts did not find that there was sufficient evidence of harm to wildlife; rather, they issued injunctions against clear-cutting until information about the existence of the wildlife could be gathered. Such decisions are inapposite where, as here, the FWS relies on possible harms to issue ITS that will severely limit Plaintiffs' use of substantial sections of land until 2006.

Defendants also claim that even if actual injury or death must be shown, the lack of a showing of injury is excusable here because the "vast majority of the District ... has not been surveyed." Def't Reply at 7. Thus, Defendants argue, there is no way to determine whether members of the listed species actually exist there. This argument is not persuasive. If there is a lack of information about the existence of the listed species, it is up to the administrative agency, not the private individual, to determine whether the listed species exist. Otherwise, a private individual affected by an ITS must either do their own independent research to ascertain whether the area is inhabited by members of the listed species or wait until the administrative agency eventually does a survey of its own.[2]

Defendants further argue that they do not have the burden of demonstrating the existence of listed species in the area. They claim that Plaintiffs bear the "burden of proving that the FWS's conclusions were arbitrary and capricious in light of the substantial deference accorded to the FWS by Congress and in light of the fact that Congress directed the FWS to give the benefit of the doubt to endangered species." Def't Reply at 9. From this, Defendants conclude that they need not

---

**2.** Moreover, as Defendants would have it, there would appear to be no duty on the agency to do such research at all. Rather, the terms and conditions of the ITS would be implemented as a "safety" measure, to prevent harm to members of a listed species in case they exist. This could properly be termed "speculative regulation."

establish the existence of the listed species on the land.

This argument is flawed for two reasons. First, while Defendants are correct to say that Plaintiffs must prove Defendants' actions were arbitrary and capricious, this does not mean that Defendants are not required to prove the likelihood of listed species on the land. The question for the court is rather this: If Plaintiffs can demonstrate that Defendants have failed to provide any convincing evidence that the listed species exist on these allotments, does that fact tend to show that Defendants were arbitrary and capricious in issuing the ITS? Thus, the burden of proving that the Defendants acted arbitrarily and capriciously still lies on the Plaintiffs, even if there is a burden on the Defendants to minimally justify the ITS issued by the FWS.

Furthermore, for the court to refuse to hold Defendants to this level of proof would be tantamount to requiring the Plaintiffs to prove a negative. It is neither practical nor just to impose on the Plaintiffs the burden of proving the absence of listed species in the project area. This would put an undue burden on any individual challenging the validity of the terms and conditions mandated by ITS contained in a Biological Opinion.

Finally, Defendants claim that even if the basis for the ITS was speculative, the ITS impose no significant limitation on Plaintiffs' use. According to the Defendants, ITS are merely an advisory opinion issued to an administrative agency that simply predicts a level of "taking" in an area where the listed species may be in jeopardy. The agency may decide for itself whether to adopt the BO and, if it does, the ITS contained in the BO then set certain terms and conditions that must be met in order for takings in the area to be immune from penalties. Thus, Defendants argue, ITS are actually designed to protect federal agencies and applicants from liability for takings under § 9 of the ESA. Then, if the level of takings is exceeded, the FWS will simply do another consultation; "it does not mean that a prohibited taking has occurred." Def't MSJ at 6.

Defendants' argument is unconvincing. The Supreme Court recently addressed the coercive nature of BO's and ITS in *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In *Bennett*, the plaintiffs were ranch operators and irrigation districts seeking relief from ITS issued by the FWS. The ITS required that minimum water levels be maintained in specified Oregon reservoirs to prevent harm to two listed species of fish. Plaintiffs argued that the ITS violated § 1536 of the Endangered Species Act of 1973. Defendants responded that a BO does not subject the Plaintiffs to harm, because it simply advises the Bureau of Reclamation of the appropriate water levels that should be maintained; it is up to the Bureau whether to adopt the ITS recommendation and implement the terms and conditions specifying required water levels.

The Court rejected the Government's argument, stating that the Biological Opinion, while advisory, "has a powerful coercive effect on the action agency." *Bennett*, 117 S.Ct. at 1164. The Court explained:

> The statutory scheme presupposes that the biological opinion will play a central role in the agency's decisionmaking process.... A Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject. When it offers reasonable and prudent alternatives to the proposed action, a Biological Opinion must include a so-called Incidental Take Statement—a written statement specifying, among other things, those measures that the [Service] considers necessary ... and the terms and conditions ... to implement [such] measures.... The Service itself is, to put it mildly, keenly aware of the virtually determinative effect of its biological opinions.

*Bennett*, 117 S.Ct. at 1164–1165 (internal quotation marks omitted). The Defen-

dants' claim that the ITS contained in the BO are merely advisory, and do not impose any limitation on Plaintiffs' conduct, ignores their practical effect: The ITS will be relied upon by the BLM to place mandatory limitations on Plaintiffs' use of the grazing allotments. Similar to the BO in *Bennett*, the FWS's BO and its accompanying ITS will be adopted by the agency and will cause severe limitations on Plaintiffs' use of the land for cattle grazing, regardless of whether any actual "takings" occur.

Several aspects of the BO bear this out. For example, the Administrative Record states that the "mandatory terms and conditions apply regardless of whether any individual razorback suckers are actually present in the watercourses adjacent to the allotments." AR1–42 at 174–175. Furthermore, because Defendants have no way of measuring the number of endangered species in the project area, they measure the level of "take" by evaluating the "total fish community and habitat." AR1–42 at 173–174. Thus, it would be possible for a "taking" of the listed species to occur without any actual harm to a member of the listed species. In this way, there is undeniable harm to the private individual who seeks to use the land. The FWS issues ITS that impose mandatory terms and conditions on the administrative agency, and the agency may respond in one of two ways. Usually, the agency will adopt and enforce the terms and conditions as a matter of course. In this case, private users are obviously harmed because their use of the land is dramatically curtailed. Alternatively, the agency may refuse to comply with the terms and conditions of the ITS, and allow free use of the land. In this case, both the agency and the private user may be subject to penalties for a "taking" that is measured not by harm to the endangered species, because there is no proof of its presence, but by

harm to the "total fish community and habitat." Either way, private users of the land will be harmed by the issuance of the ITS.

Thus, Defendants have failed to provide sufficient reason to believe that listed species exist in the allotments in question. The ITS identify only degradation to potential habitats, rather than actual injury or death to existing members of the listed species. Thus, Defendants are unable to demonstrate that cattle grazing will result in "harm"—injury or death to members of a listed species—and are unable to meet the definition of "take" in the Regulation. Both the Regulation and the Supreme Court clearly state that to constitute a "take," harm to a listed species must include a showing of actual death or injury to wildlife. Accordingly, Defendants' issuance of the ITS in this case, with virtually no evidence that listed species even exist on the land, constitutes an arbitrary and capricious action and, as such, must be set aside by this court.[3]

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiffs' Motion for Partial Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

---

**3.** Because the court finds that the issuance of the ITS by the FWS was arbitrary and capricious, the court need not reach the question of whether the terms and conditions contained in those ITS's complied with the requirements set forth in the FWS's Regulations.