**FOREST CONSERVATION COUNCIL,**
Plaintiff–Appellant,

v.

**ROSBORO LUMBER COMPANY,**
Defendant–Appellee.

No. 94–35070.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 12, 1995.

Decided March 24, 1995.

Gary K. Kahn, Reeves, Kahn and Eder, Portland, OR, for plaintiff-appellant.

Steven P. Quarles, Crowell & Moring, Washington, DC, for defendant-appellee.

Jeffrey P. Kehne, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for amicus curiae.

Before: PREGERSON, TROTT, Circuit Judges, and FITZGERALD,* Senior District Judge.

PREGERSON, Circuit Judge:

Plaintiff–Appellant Forest Conservation Council ("FCC") appeals the district court's order granting summary judgment in favor of Defendant–Appellee Rosboro Lumber Company ("Rosboro"). FCC sued Rosboro under the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), for violating 16 U.S.C. § 1538(a)(1)(B), which prohibits the "taking" of a federally listed threatened species without a permit from the United States Fish and Wildlife Service. The district court concluded that FCC's claim of a future injury to a pair of Northern Spotted Owls was insufficient to establish an actionable taking under 16 U.S.C. § 1538(a)(1)(B). We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand.

## BACKGROUND

On May 2, 1992, Defendant–Appellee Rosboro Lumber Company applied to the Oregon Department of Forestry for a permit to harvest timber on private lands in Lane County, Oregon. The application indicated that Rosboro planned to clearcut approximately 40 acres of timber. The application also noted that the activity would occur in an area that was a "threatened or endangered species site."

The Oregon Department of Forestry granted the permit, and prepared a forest activity inspection report. The report noted that Rosboro's proposed activity would occur on land adjacent to the 1991 nesting site of a pair of Northern Spotted Owls. The report also noted that compliance with the state's forest practice rules would not necessarily satisfy the requirements of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1540 (1988).

To cut the timber on private lands, Rosboro needed to travel over land administered by the Federal Bureau of Land Management ("BLM"). Accordingly, Rosboro sought permission from BLM to build a road over its land. In June 1991, BLM authorized Rosboro to build the access road.[1] But BLM noted in an environmental assessment that the proposed project will occur in forested lands in the Swartz Creek area that have been identified as habitat for a pair of Northern Spotted Owls. The assessment indicated that Rosboro's road construction work would occur within a half mile of the Swartz Creek owls' nesting site. The record shows that the timber harvest on Rosboro's land would occur even closer to the owls' nesting site. Accordingly, BLM informed Rosboro that its proposed project, "may result in an incidental take of the Swartz Creek owl pair and/or a juvenile owl."

The Endangered Species Act provides that "with respect to any endangered species of fish or wildlife ... it is unlawful for any person ... to take any such species." 16 U.S.C. § 1538(a)(1)(B). This provision has been extended to "threatened" species. 50 C.F.R. § 17.31(a) (1993). The northern spotted owl "is threatened throughout its range by the loss and adverse modification of suitable habitat as the result of timber harvesting." 55 Fed.Reg. 26114 (1990).

An exception to the federal ban on the taking of protected wildlife is found in 16 U.S.C. § 1539(a). This section allows anyone

---

* The Honorable James M. Fitzgerald, Senior U.S. District Judge for the District of Alaska, sitting by designation.

1. A pre-existing access agreement required the BLM to issue this permit.

who plans to undertake activity that will result in an "incidental take" of an endangered or threatened species to apply for a permit from the United States Fish and Wildlife Service ("FWS"). In granting access over the BLM land, BLM advised Rosboro of its responsibility to obtain an incidental take permit from FWS before carrying out its project. BLM also informed FWS that Rosboro's road construction and timber harvest on private lands may result in an incidental take.

Rosboro did not apply for an incidental take permit and proceeded to build the access road in the summer of 1992. On September 9, 1992, Plaintiff–Appellant Forest Conservation Council ("FCC") sued Rosboro in the United States District Court for the District of Oregon, seeking to enjoin Rosboro from clearcutting the timber on private lands. Pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), FCC alleged that because Rosboro failed to apply for an incidental take permit, its proposed activity constitutes a "take" in violation of 16 U.S.C. § 1538(a)(1)(B). FCC proffered evidence to show that Rosboro's planned timber harvest is reasonably certain to injure the Swartz Creek owl pair by significantly impairing their essential behavioral patterns, including breeding, feeding, and sheltering.

FCC and Rosboro filed cross motions for summary judgment. On November 18, 1993, the district court denied FCC's motion for summary judgment and granted Rosboro's motion for summary judgment. The district court concluded that the ESA requires a plaintiff to show either a past or current injury to a protected species, unless the challenged action threatens that species with extinction. Because FCC only alleged a *future* injury to the Swartz Creek owl pair, and did not allege that Rosboro's activity will threaten the extinction of the Northern Spotted Owl, the district court concluded that FCC's suit was premature. FCC now appeals.

## ANALYSIS

We review a grant of summary judgment de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* The interpretation of a statute is a question of law reviewed de novo. *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993).

Because applying for an incidental take permit is not mandatory, and FCC has conceded as much, the issue we address on appeal is whether the district court correctly interpreted the ESA to foreclose citizen suits that only allege a future injury to a protected species. We conclude that the district court misconstrued the ESA.

The district court's construction is antithetical to the basic purpose of the ESA to protect endangered and threatened species and prevent their further decline. The language and legislative history of the ESA, as well as applicable case law support our holding today that a showing of a future injury to an endangered or threatened species is actionable under the ESA.

Congress enacted the Endangered Species Act in 1973 in response to growing public concern about extinctions of various species of fish, wildlife, and plants caused by economic growth and development untempered by adequate concern and conservation. 16 U.S.C. § 1531(a). 16 U.S.C. § 1538 makes it unlawful for anyone to "take" any endangered or threatened[2] species. "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

The dispute we are called upon to resolve is the scope of the term "harm." Rosboro contends that "harm" only includes actions that constitute a past or current injury to an endangered or threatened species, or actions that threaten such species with extinction. FCC, on the other hand, contends that

2. As noted above, the U.S. Fish and Wildlife Service has extended all ESA provisions to threatened species.

"harm" includes actions that pose an imminent threat of injury to a protected species, including habitat modifications that retard the recovery of such species.

In carrying out our duty of ascertaining and applying the intent of Congress, we must "interpret language in one section of a statute consistently with language of other sections and with the purposes of the entire statute considered as a whole." *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). For the reasons stated below, we conclude that the ESA's language, purpose, and structure authorize citizens to seek an injunction against an imminent threat of harm to a protected species. With respect to the question whether the ESA proscribes habitat modifications that retard species recovery, we need not reach it because FCC has proffered sufficient evidence to show that Rosboro's logging is reasonably certain to injure the Swartz Creek owl pair by significantly impairing its essential behavioral patterns.

## A. The Threat of Imminent Harm to Protected Species

### 1. Statutory Language

We start with the plain language of 16 U.S.C. § 1538(a)(1)(B), which makes it unlawful for anyone to "take" a protected species. 16 U.S.C. § 1532(19) defines "take" as any action that, *inter alia,* "harms" wildlife. While Congress did not define "harm," it explicitly intended the term "take" to be construed broadly: "Take" is to be "defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S.Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.

It is clearly conceivable that one can inflict great harm on a protected species by creating an imminent threat of harm to that species. Such a threat therefore falls easily within the broad scope of Congress' definition of "take."

Nevertheless, Rosboro relies on the Secretary of the Interior's ("Secretary") definition of "harm" for the proposition that plaintiffs can seek an injunction only against injuries that have already occurred, or that are presently ongoing. In 1981, the Secretary promulgated a re-definition of "harm" as follows:

> *Harm* in the definition of "take" ... means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3. Rosboro argues that the term "actually" requires a plaintiff to show that a challenged action already has caused, or presently is causing, an injury; claims of a future injury, no matter how imminent, are foreclosed. We disagree.

The Secretary's use of the term "actually" was not intended to foreclose claims of an imminent threat of injury to wildlife. Rather, because the Secretary was concerned that the old definition of "harm" could be read to mean habitat modification *alone,* the Secretary inserted the phrase "actually kills or injures wildlife" to preclude claims that only involve habitat modification without any attendant requirement of death or injury to protected wildlife. 46 Fed.Reg. 54748–49 (1981).

Nowhere does the re-definition of "harm" or its explanatory commentary require historic injury to protected wildlife. So long as some injury to wildlife occurs, either in the past, present, or future, the injury requirement of the Secretary's new definition would be satisfied. We conclude that a showing of an imminent threat of injury to wildlife suffices.

FCC does not seek to enjoin habitat modification alone, but rather, habitat modification that is reasonably certain to injure the Swartz Creek owl pair by impairing their essential behavioral patterns. Such a claim satisfies the "actual injury" requirement.

Rosboro next points out that FCC's claim is barred because the Secretary noted that a claim for a "potential injury" to wildlife would not be actionable. *Id.* at 54749. The word "potential" means "existing in possibili-

ty." *Webster's New International Dictionary* (2d ed. 1939). Thus, "potential injury" denotes only injury that may or may not occur. In contrast, FCC alleges that Rosboro's project creates an *imminent threat* of death or injury to the Swartz Creek owl pair. The word "imminent" means "ready to take place; near at hand." *Id.* The two assertions are clearly distinct. As discussed, *infra*, courts have concluded that the Secretary juxtaposed the terms "actually" and "potentially" to specify the degree of certainty that harm would befall a protected species, as opposed to the timing of the injury.

### 2. Statutory Purpose

■ Any ambiguity in what Congress meant by the term "harm" is resolved by looking to the underlying purpose of the ESA. When Congress has not addressed an issue, we must "find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *United States v. Koyomejian*, 946 F.2d 1450, 1453 (9th Cir.1991) (citations omitted).

Congress' overriding purpose in enacting the ESA indicates that it intended to allow citizen suits to enjoin an imminent threat of harm to protected wildlife. The stated purposes of the ESA are twofold: (1) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and (2) "to provide a program for the conservation of such ... species." 16 U.S.C. § 1531(b).

The district court's conclusion that the ESA forecloses citizen-suit claims of an imminent threat of harm to protected wildlife is contrary to the letter and spirit of the statute's purpose—to *conserve* endangered species. In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978), the Supreme Court concluded that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."

Once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult. As the Supreme Court noted, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). FCC aptly argues that forcing it to wait until after harm has been inflicted would render their claims moot before they become ripe.

### 3. Other Provisions of the ESA

■ Finally, the overall structure of the ESA indicates that Congress intended to make claims of an imminent threat of injury to wildlife actionable under the ESA.

First, the injunctive relief authorized by the citizen suit provision, 16 U.S.C. § 1540(g), is by its very nature directed at future actions. Section 1540(g) does not contain any requirement that claims of a future injury to wildlife be based on past injury. The legislative history of this provision, although sparse, indicates that Congress anticipated citizen suits to enjoin prospective injuries. *See* H.R.Rep. 412, 93d Cong., 1st Sess. 19 (1973) U.S. Code Cong. & Admin. News 1973, P. 979 ("citizen actions ... allow any person ... to seek remedies involving injunctive relief for violations or *potential* violations") (emphasis added).

Any doubt as to Congress' intent to authorize citizen suits to enjoin the imminent threat of injury to wildlife is dispelled by examining the legislative history of 16 U.S.C. § 1540(e)(6), which shows the unmistakable intent of Congress to authorize the Attorney General to enjoin such threats. The legislative history of this provision is instructive because "language used in one portion of a statute ... should be deemed to have the same meaning as the same language used elsewhere in the statute." *Mertens v. Hewitt Assoc.*, —— U.S. ——, ——, 113 S.Ct. 2063, 2070, 124 L.Ed.2d 161 (1993).

Both the citizen suit provision and the Attorney General's enforcement provision authorize suits "to enjoin any person who is alleged to be in violation of [the ESA]." In fact, Congress conferred on the Attorney General the authority to seek injunctions to

enforce the ESA because it sought to provide the Attorney General with the same authority already accorded to private citizens. *See* S.Rep. 418, 97th Cong., 2d Sess. 24 (1982), U.S.Code Cong. & Admin.News 1982, p. 1411 ("Although ... the Act accords private citizens the right to seek injunctive relief, no such Federal enforcement authority is explicitly provided to the Attorney General. Section 9 ... explicitly provides such authority.").

Congress explained that the reason it authorized injunctive relief was to prevent prospective harm:

Injunctions provide greater opportunity to attempt resolution of conflicts *before* harm to a species occurs.... The ability to enjoin a violation of the Act rather than the ability only to prosecute a completed violation will better serve the interests of the public, the *potential* violator and the *potentially* harmed species.

*Id.* (Emphasis added.) Because Congress modeled the provision authorizing the Attorney General to seek injunctions after the citizen suit provision, we have no problem inferring Congress' implicit intent to authorize private plaintiffs to enjoin a "potential violator" "before harm to the species occurs."

Finally, although the citizen suit provision requires plaintiffs to give defendants 60 days notice before filing suit, an exception is made for actions that "pos[e] a significant risk to the well-being of any [protected species]." 16 U.S.C. § 1540(g)(2)(C). Plaintiffs may seek relief for such claims "immediately" after notifying the Secretary. *Id.* This exception clearly demonstrates Congress' intent to stop imminent threats of injury to protected wildlife. Nowhere does Congress indicate that a plaintiff's standing to enjoin such grave threats is contingent upon a showing of past injury.[3]

### 4. Case Law

In addition to our analysis of the ESA's language and legislative history, several cases support our conclusion that Congress intended to authorize plaintiffs to enjoin an imminent threat of injury to protected species.

In *Palila v. Hawaii Dept. of Land & Natural Resources*, 852 F.2d 1106, 1110 (9th Cir.1988) (*Palila II*), we held that "habitat destruction that *could* result in extinction" constitutes a "taking" in violation of 16 U.S.C. § 1538. (Emphasis added.) We affirmed the district court's order requiring the State to remove the moufloun sheep that ate the mamane-naio woodlands upon which the Palila birds depend. *Id.*

The district court's finding that the moufloun sheep could drive the Palila birds to extinction was based, in part, on evidence that before new mamane trees can mature, "the moufloun sheep *can* kill the mamane trees." *Id.* at 1109 (emphasis added). Thus, we upheld an injunction against prospective harm, and rejected the State's contention that the ESA only prohibits acts which result in the *immediate* destruction of the Palila's food sources. *Id.* at 1108. Contrary to Rosboro's assertion, our interpretation of the ESA was not contingent on the fact that the moufloun sheep had already eaten some of the mamane trees.

Relying on *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), Rosboro nevertheless insists that to state a claim under the ESA, plaintiffs must allege either a past or current injury. Rosboro misreads *Gwaltney*. In *Gwaltney*, the defendant ceased violating the permit provision of the Clean Water Act several weeks before the plaintiffs filed the lawsuit. *Id.* at 53–54, 108 S.Ct. at 379. In contrast to the question before us, the question presented to the Court in *Gwaltney* was whether a citizen suit could be maintained for unlawful conduct that occurred *entirely in the past*. The plaintiffs in *Gwaltney* did not allege any present or future violations. The Court not-

---

**3.** Our interpretation of "harm" is limited to the enforcement of the ESA through injunctions under the citizen suit provision. As such, our holding today does not have any bearing on the enforcement provisions that allow the Attorney General to seek civil and criminal penalties for a "knowing violation" of the ESA. *See* 16 U.S.C. §§ 1540(a) and (b). Thus, while a private plaintiff may seek to enjoin an imminent threat of harm to protected wildlife, such a threat alone would not be subject to civil and criminal penalties.

ed that Congress intended the citizen suit provision of the Clean Water Act to be used to abate ongoing violations, and thus interpreted the Clean Water Act to require plaintiffs to "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 59–60, 108 S.Ct. at 381, 382.

The Court did not address whether citizen suits can be maintained for claims of only future violations, and in no way implied that such claims are not actionable. In fact, the Court noted that "the interest of the citizen-plaintiff is primarily forward-looking." *Id.* at 59, 108 S.Ct. at 382.

In *Tennessee Valley Authority,* 437 U.S. at 172–73, 98 S.Ct. at 2290–91, the Supreme Court enjoined the future operation of a dam that threatened to destroy the critical habitat of the endangered snail darter. Thus, even though the TVA already had expended billions of dollars to construct the dam, the Court directed the lower court to issue a permanent injunction to halt the dam's operation.

In so deciding, the Court substituted the traditional equitable discretion of balancing the parties' competing interests with a standard that favors endangered species to better effectuate the purpose of the ESA: "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Id.* at 194, 98 S.Ct. at 2301. Accordingly, the Court did not require the plaintiffs to establish first that the TVA's actions had already killed or injured a snail darter. Evidence which showed that the dam would decimate the snail darter provided sufficient basis for the injunction.

Other circuits besides our own have recognized that the ESA authorizes injunctions against a future injury to a protected species. In *American Bald Eagle v. Bhatti,* 9 F.3d 163, 166 (1st Cir.1993), the First Circuit made clear that the Secretary used the terms "actually" and "potentially" in the redefinition of "harm" to specify the *degree of certainty* that injury would befall a protected species, as opposed to the *timing* of the

injury: "[C]ourts have granted injunctive relief only [if] the alleged activity has actually harmed the species or ... *will actually,* as opposed to potentially, cause harm to the species." (Emphasis added.) The court held that the challenged deer hunts would not harm the endangered bald eagles after considering, among other factors, "the *likelihood* of the presence of lead in ... deer, the *likelihood* of ingestion of lead by eagles feeding on the deer, and the *likelihood* that if an eagle ingests lead, it will be harmed thereby." *Id.* (Emphasis added.)

Rosboro's citation of *Pacific Northwest Generating Coop. v. Brown,* 25 F.3d 1443 (9th Cir.1994), to support its position is misguided. There, we rejected the plaintiffs' argument that the "taking" of a listed species of salmon should not be characterized as merely "incidental." *Id.* at 1452. We explained that Congress could not have intended to prohibit all salmon fishing just because a listed species of salmon cannot be distinguished by sight from an unlisted species. *Id.* Thus, we did not address the question whether the imminent threat of harm to a protected species was actionable under the ESA.

Equally misplaced is Rosboro's reliance on *Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy,* 898 F.2d 1410 (9th Cir.1990). There, we declined to enjoin the Navy's outlease program which diverted water from the endangered cui-ui fish because there was no evidence that the program was the cause of the cui-ui's spawning problems. *Id.* at 1420. Thus, the defect of the plaintiff's claim lay in the lack of a causal connection between the challenged action and the alleged injury to the protected species, not in the timing of the injury.

■ In contrast to the cases cited by Rosboro, FCC has proffered sufficient evidence to show that Rosboro's logging activity is reasonably certain to harm the Swartz Creek owl pair and that such harm is imminent. Fed.R.Civ.P. 56(e) provides that in opposing a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing

that there is a genuine issue for trial." We conclude that FCC has met this requirement.

The BLM biologist who helped to prepare the BLM's environmental assessment of Rosboro's right-of-way application declared that the proposed timber harvest is reasonably certain to injure the Swartz Creek owl pair by significantly impairing their essential behavioral patterns, including breeding, feeding, and sheltering. Viewing FCC's evidence in the light most favorable to them, the non-moving party, *Jesinger*, 24 F.3d at 1130, we conclude that the evidence, if proved, would demonstrate the reasonable certainty of harm.

FCC has also established the imminence of the harm: Rosboro has applied for a permit to clearcut the forest, and has finished building a road to provide access to the harvest site. It is undisputed that Rosboro plans to clearcut the timber as soon as possible.

However, because disputed facts remain as to whether the harvest is reasonably certain to impair the Swartz Creek owl pair's essential behavioral patterns, we remand for an appropriate finding. Accordingly, it was improper for the district court to grant summary judgment in favor of Rosboro.

## B. Habitat Modifications That Impede the Recovery of Endangered or Threatened Species

The district court ruled that a claim of prospective injury is actionable only if the challenged action threatened the protected species with extinction. The court concluded that habitat modifications that merely retard species recovery are not proscribed by the ESA.

Although our case law suggests a contrary view,[4] we need not decide this issue because FCC has proffered sufficient evidence to show that Rosboro's habitat modification would actually injure the Swartz Creek owl pair by significantly impairing their essential behavioral patterns, including breeding, feeding, and sheltering. Habitat modifications that significantly impair a protected species' essential behavioral patterns are explicitly proscribed by the Secretary's redefinition of "harm," as discussed *supra.*

## CONCLUSION

For the foregoing reasons, we hold that FCC's suit to enjoin Rosboro's timber harvest is actionable under the ESA. To hold otherwise would frustrate rather than effectuate the clear intent of Congress.

**REVERSED and REMANDED.**

---

4. As we noted *supra,* in *Palila II,* 852 F.2d at 1108, we held that habitat destruction that could result in extinction was actionable under the ESA. However, in *Palila II,* we left open the question "whether harm includes habitat degradation that merely retards recovery" of a protected species. 852 F.2d at 1110. In *National Wildlife Federation v. Burlington Northern Railroad, Inc.,* 23 F.3d 1508, 1513 (9th Cir.1994), we held that the plaintiffs can establish "harm" if they could "prove that the habitat degradation prevents, or possibly, *retards, recovery of the species.*" (Emphasis added.) We noted that the ESA does not require a threat of extinction before an injunction may issue because "[t]his would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps." *Id.* at 1512 n. 8.