**COALITION FOR SUSTAINABLE RESOURCES, INC., a Colorado corporation, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, et al., Defendants,**

**Biodiversity Associates, et al., Intervenor–Defendants.**

No. 98–CV–174–B.

United States District Court, D. Wyoming.

May 13, 1999.

William Perry Pendley, Mountain States Legal Foundation, Denver, CO, James Witwer, Trout & Raley, P.C., Denver, CO, for plaintiff.

Jane P. Davenport, Edward A. Boling, Department of Justice, Washington, DC, for defendants.

Michael R. Hope, Patton Boggs, L.L.P., Denver, CO, Mark S. Squillace, University of Wyoming, College of Law, Laramie, WY, for intervener–defendants.

## *ORDER GRANTING FEDERAL DE-FENDANTS' MOTION TO DISMISS AND GRANTING INTERVENER'S MOTION TO DISMISS*

BRIMMER, District Judge.

This case arises from the alleged improper forest management techniques used by the United States Forest Service in the Medicine Bow National Forest and the alleged injury to endangered species caused by such techniques. The United States Forest Service has brought a motion to dismiss, arguing that the plaintiff lacks standing and otherwise fails to state a claim upon which relief can be granted. Additionally, the Interveners have brought a motion to dismiss, arguing that this case is not ripe for judicial resolution. For the reasons that follow, the Court **ORDERS** that both motions are **GRANTED**, and that all further proceedings are hereby **VACATED**.

*Factual Background*

This suit has been brought by the Coalition for Sustainable Resources ("CSR"). CSR is a non-profit corporation organized for the purpose of encouraging the prompt recovery of species designated under the Endangered Species Act ("ESA") by using sound techniques in a manner that avoids unnecessary interference with private property rights. (Compl.¶5.) CSR's members include ranchers, farmers, and other water users in Wyoming and Colorado whose water-use practices are subject to restriction under the ESA. (Compl.¶8.)

Defendant United States Forest Service ("USFS") is responsible for the oversight, management, and care of the National Forest System, including the Medicine Bow National Forest in Wyoming. (Compl.¶10.) CSR has also named various officers and employees of the United States government as defendants in their official capacities for their roles and responsibilities in managing the Medicine Bow. (Compl.¶¶11–15.)

The Intervenor–Defendants (the "Biodiversity Parties") have fought to protect the natural environment of the Medicine Bow. In particular, their efforts include challenging past attempts by various parties to allow clear-cutting portions of the Medicine Bow.

CSR claims to be interested in the recovery of the following endangered species: The Whooping Crane, the Least Tern, the Piping Plover, and the Pallid Sturgeon. (Compl.¶¶16–19.) These endangered species have habitats along the Platte River in Nebraska. (Compl.¶¶16–19.) CSR alleges that increased river flow in the central Platte River is necessary to protect the listed species. (Compl.¶20.)

The Fish and Wildlife Service ("FWS") estimates that at least 238,000 more acre-feet of water will need to be delivered annually, in addition to current flows, to meet the target flows established for the listed species. (Compl.¶21, Ex. 1.) Final Biological Opinions issued by FWS conclude that the continuation of evaporation and other water depletions of as little as .7 acre-feet per year from the Platte River tributary streams would jeopardize the continued existence of the listed species. (Compl.¶22.)

National Forests were established for the purposes, among other things, of securing favorable conditions of water flows and furnishing a continuous supply of timber. (Compl.¶26.) The Medicine Bow, Routt, Roosevelt, and other nearby National Forests include lands that are within the watershed of the Platte River. (Compl.¶29.) Forest Plans guide all natural resource activities and establish management standards and guidelines for the National Forest System. (Compl.¶32.)

According to the original Forest Plan for the nearby Arapaho and Roosevelt National Forests in northern Colorado, the annual water yields from those Forests can be increased depending on the extent and location of the vegetation treatment and/or snow management activities, and the constraints of water quality management standards. (Compl.¶33.) A maximum increase of 240,000 acre-feet per year, for a total of 2.21 million acre-feet per year, could be provided in those Forests without degrading water quality. (Compl.¶33.) CSR alleges that a substantial portion of the 240,000 acre-feet potential would accrue to the Platte River drainage. (Compl.¶34.)

Similarly, the original Forest Plan for the adjacent Routt National Forest could have been increased 103,000 acre-feet by 1991. (Compl.¶35.) A substantial portion of this increase in water yield would accrue to the Platte River drainage. (Compl.¶36.)

In the environmental analysis which produced the Forest Plan for the Medicine Bow, USFS developed a benchmark for maximum water yield production by assigning various management prescriptions to lands within the Forest. (Compl.¶37.) This analysis further limited the maximum

water yield benchmark. (Compl.¶ 37.) Consistent with this analysis, the maximum water yield for the Medicine Bow showed a potential increase ranging from approximately 41,000 to 53,500 acre-feet. (Compl.¶ 38.) A substantial portion of this potential increased yield would accrue to the Platte River drainage. (Compl.¶ 39.)

In a recent study (the "Coon Creek Study") completed pursuant to the Medicine Bow Forest Plan, USFS harvested 24 percent of a 4133 acre catchment and concluded that such vegetation management techniques significantly increased water flows during the months when FWS believed the listed species suffer from insufficient water. (Compl.¶ 40.) Because substantial portions of the aforementioned forests lie within the Platte River Basin, a substantial portion of the total water yield increase could be produced annually (from vegetation and snow management techniques) to the Platte River and its tributaries. (Compl.¶ 42.) Thus, the implementation of vegetation and snow management programs on National Forest Lands within the Platte River drainage can produce most or all of the 238,000 acre-feet of the additional water that FWS asserts is necessary for the recovery of the listed species. (Compl.¶ 44.)

CSR asserts that the activities explained above have not occurred and USFS has continued to manage these National Forests in a manner that will continue to increase forest density. (Compl.¶ 45.) Research by USFS shows that dense, uniform forests yield less water than diverse forests with openings. (Compl.¶ 47.)

Furthermore, since the creation of the Medicine Bow, USFS fire suppression, pest control, and other vegetation management techniques have decreased the amount of water produced from that forest. (Compl.¶ 48.)

Timber harvest is a proven technique that can increase water yield, and from 1986–1995 the total timber sale was only 58 percent of the allowable sale quantity ("ASQ") prescribed in the Medicine Bow Forest Plan. (Compl.¶ 50.) The 1997 Annual Report indicates that the trend of not meeting the ASQ has persisted through 1996 and 1997. (Compl.¶ 51.) Further, one or more of the federal defendants has announced that USFS intends to dramatically decrease the ASQ. (Compl.¶ 52.)

Based on these allegations, CSR has filed a three Count Complaint. The first two counts have been brought via the "citizen-suit" provision, and under 16 U.S.C. § 1536(a)(1) of the ESA. In its first Count, CSR alleges that Defendants have failed to manage the Medicine Bow to maximize water available to listed species under the ESA. CSR alleges that the defendants have not used "all methods and procedures" necessary to bring the listed species to the point at which measures provided by the ESA are not necessary. (Compl.¶¶ 56, 57.) CSR further alleges that Defendants have violated and continue to violate the ESA by not implementing snow and vegetation techniques to increase water flow to the Platte River Basin. (Compl.¶ 60.)

CSR's second Count alleges that the defendants have managed the Medicine Bow forest vegetation to the detriment of the listed species under the ESA. Here CSR alleges that past and present USFS forest vegetation management will continue to exacerbate water shortages to listed species and that the defendants have a duty to prevent an increase in forest density to pre-National Forest levels. These actions have allegedly continued to decrease the quantity of water produced by the Medicine Bow.

CSR's third Count alleges that the defendants have violated the requirements of the Forest and Rangeland Renewable Resources Planning Act ("FRRRPA," also known as the National Forest Management Act), 16 U.S.C. § 1600 et seq., by failing to implement snow and vegetation management programs (as described in the environmental analysis, Forest Plan,

and Coon Creek Report) to maximize water flows from the Medicine Bow to the benefit of listed species. Further, the defendants have allegedly continued to violate FRRRPA by failing to comply with the Forest Plan prohibition against an increase in forest density above historic and pre-National Forest levels.

CSR seeks the following relief regarding the Medicine Bow: (1) that this Court adjudge and declare that the defendants are violating the ESA by not implementing proper snow and vegetation management programs, as described in the Forest Plan, its environmental analysis, and the Coon Creek Report, that maximize water flow to the listed species in Nebraska; (2) that this Court adjudge and declare that the defendants are violating the ESA by failing to prevent an increase in forest density above pre-National Forest and historic levels; (3) that this Court adjudge and declare that the defendants are violating FRRRPA in various ways; (4) that this Court enjoin the defendants from further violations of the ASQ requirements in the Forest Plan and require an increase in the current ASQ requirements; (5) that this Court enjoin Defendants from allowing any further increases in forest density; and (6) if this Court should grant the previous relief requested, that it require the defendants to satisfy such an order without interference to private property rights.

### Medicine Bow Background and Statutory Background For National Forest Management Act

The Medicine Bow National Forest was reserved in 1902. The forest is located in south-central Wyoming. The Medicine Bow is not a contiguous land unit, but instead encompasses four separate areas. The Medicine Bow is approximately 1,095,-386 acres in size. Approximately 65% of this forest drains into the Platte River Basin.

The National Forest System lands are managed under a framework set out by the National Forest Management Act ("NFMA") of 1976, 16 U.S.C. § 1600 et seq. Pursuant to this Act, USFS devises Forest Plans to manage the forest lands. As required by NFMA, these plans involve the public in selecting a plan to manage the forests under "multiple use and sustained" yield principles and disclose the environmental impacts of a range of management scenarios consistent with the National Environmental Policy Act of 1969. *See* 16 U.S.C. § 1604(d), (e), (g) (1994). The multiple uses that the plans provide for are: Outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. *See* 16 U.S.C. § 1604(e)(1) (1994). The forest plans also are required to identify those areas of forests that are not suited for timber production, *see* 16 U.S.C. § 1604(k) (1994), and to establish ASQ requirements for a forest over the life of a plan. *See* 36 C.F.R. § 219.16 (1998). These forest plans are revised after a ten to fifteen-year period. *See* 16 U.S.C. § 1604(f)(5) (1994).

The Medicine Bow Forest Plan[1] expressly stated that its purpose was to ensure compliance with the statutory mandate of NFMA, to develop and maintain a management system that uses a interdisciplinary approach to achieve integrated consideration of physical, biological, economic and other sciences, and to provide assessment through current modeling techniques to make forecasts of the outputs which could be produced under the

---

1. Although the Medicine Bow Forest Plan was not attached to the Complaint, the Court may consider it in this motion to dismiss because the defendants have provided the Court with an authentic copy attached as exhibit 1 to their memorandum in·support of their motion. "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997)

Forest Plan and other alternatives to the Plan. The Forest Plan also cautioned that the forecasts of outputs that could be produced under this Plan may not occur at the projected number.

The 1985 Medicine Bow Forest Plan is presently being revised. This revision process began in 1992 and is scheduled to be completed by May 2001.

### The Endangered Species Act

The ESA, 16 U.S.C. § 1531 et seq. (1994), seeks to protect species of animals against threats to their continuing existence caused by man. *See generally TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA has directed that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authority to further the purposes of the ESA.

The Secretaries of Commerce and the Interior jointly administer the ESA through the National Marine Fisheries Service and FWS. The ESA instructs the Secretary of the Interior to promulgate by regulation a list of those species that are either endangered or threatened, and to define the critical habitat of these species. *See* 16 U.S.C. §§ 1533, 1536 (1994). Once a species is listed and a critical habitat is designated, specific substantive and procedural protections are accorded to that species and its habitat. *See, e.g.,* 16 U.S.C. § 1536(a)(2) (1994).

At issue in this lawsuit is § 1536(a)(1) (also known as Section 7(a)(1)), which directs federal agencies to carry out their programs "in a manner consistent with the conservation of endangered and threatened species." *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of the Navy,*

898 F.2d 1410, 1416 (9th Cir.1990). The amount of discretion accorded to agencies in carrying out their duties under this provision is a source of contention in this lawsuit.

### Discussion

### I. Motion to Dismiss Standards[2]

The federal defendants have moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss Plaintiff's complaint. The standards for a motion to dismiss are well established and need only be briefly restated. When ruling on a 12(b)(6) motion to dismiss, the Court takes all well-pleaded allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Realmonte v. Reeves,* 169 F.3d 1280, 1283 (10th Cir.1999). Conversely, in a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court can look beyond the pleadings if the defendant is not asserting a facial attack. *See Holt v. United States,* 46 F.3d 1000, 1002–03 (10th Cir.1995). However, as will be more fully discussed below, the Court's review of the law on standing reveals that the defendants may not submit additional materials to defeat standing at the motion to dismiss stage, despite the fact that standing is a jurisdictional question. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

### II. Standing[3]

Defendants have attacked the standing of Plaintiff to bring this lawsuit. Standing is grounded in Article III of the U.S. Constitution, which restricts federal court adjudication to actual cases or controversies. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**2.** Although materials outside the complaint were submitted to the Court, it will not convert the instant motion into one for summary judgment.

**3.** For reasons that will be explained later in this order, the standing and ripeness analyses will only deal with Plaintiff's ESA claims be-

cause Plaintiff's NRRRPA claim must be dismissed because the United States has not waived its sovereign immunity. Any NRRRPA claim must be brought through the APA, where a waiver of sovereign immunity can be found.

"Standing is but one of several gatekeepers founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Utah v. Babbitt,* 137 F.3d 1193, 1201 (10th Cir.1998) (internal quotation marks omitted).

Because Plaintiff has invoked Article III jurisdiction to challenge the conduct of the executive branch of the federal government, the necessity of a case or controversy is of extreme importance. *See id.* at 1202. "The warnings against unrestrained exercise of the power of judicial review over the conduct of the executive or congressional branches by relaxing the standing requirements are numerous and dire." *Id.* (citing numerous authorities). Accordingly, "[t]hese principles mandate strict compliance with the standing requirements." *Id.* (citing *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997)).

■  The following elements must be established by the plaintiff to demonstrate standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

■  The standing requirements are not mere pleading requirements, but instead are an indispensable part of the plaintiff's case; "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages

of litigation." *Id.* at 561, 112 S.Ct. 2130. At the motion to dismiss stage, general factual allegations of injury resulting from the defendants' conduct will suffice because upon a motion to dismiss, the Court presumes that the general allegations embrace the more specific allegations. *See id.* Upon a motion for summary judgment, however, the plaintiff can no longer rest upon mere allegations and must put forth specific facts by affidavit or other evidence. *See id.* And at the final stage, those facts must be supported by the evidence. *See id.*

■  This brings up a preliminary matter that must be addressed. Defendants have submitted an entire volume of additional evidence in support of their motion to dismiss. Although not mentioned in their brief, Defendants apparently assumed that since their motion was, in part, one to dismiss for lack of standing (which is jurisdictional in nature) additional materials could be submitted without converting the motion to one for summary judgment. Plaintiff has opposed this attempt, citing the principles announced above. The Court has since conducted an exhaustive review of the law in this area. As it turns out, although standing is jurisdictional in nature, courts have treated standing "different" than other jurisdictional issues on a motion to dismiss. *Lujan* specifically avers that standing is to be analyzed at successive stages under differing burdens on the plaintiff. This notion goes against the idea of allowing the defendants to submit outside evidence at the motion to dismiss stage to defeat standing. Furthermore, the Court did not uncover one case where the defendant was allowed to submit additional evidence to defeat standing at the motion to dismiss stage; indeed, to do so flies in the face of *Lujan's* explanation of differing burdens at successive stages in the litigation.

However, even though the defendants may not submit additional evidence, the plaintiff may. This principle was recog-

nized in *Warth v. Seldin*, where the Supreme Court stated:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

▪ The Court also notes that the "zone of interests" requirement is not applicable to Plaintiff's claims under the ESA because the Supreme Court specifically found in *Bennett v. Spear* that citizen suit provision of the ESA (under which this lawsuit is brought) "negates the zone of interest test." 520 U.S. 154, 164, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Thus, any "harm" claimed by the plaintiffs will suffice to show standing; the harm claimed need not be within the zone of interests contemplated by the statute.

If the Court were only to look at the plaintiff's complaint, it would have no trouble concluding that its cryptic standing allegations have failed to meet the requirements of standing. In its Complaint, Plaintiff alleges that its members have a particularized interest in the preservation and recovery of species. (Compl.¶ 6.) This statement begs the question: What particularized interest is being claimed? Likewise, Plaintiff claims that if its complaint goes unaddressed, it will suffer serious adverse impacts to legally protected interests. (Compl.¶ 8.) Again, such a statement begs the question.

▪ However, in its opposition to the federal defendants' motion to dismiss, Plaintiff has made standing a much closer question. Plaintiff attempts to satisfy the injury in fact requirement through the affidavits of Kurt S. Bucholz and William Kent Crowder, members of CSR.[4] Bucholz alleges that his water rights under Wyoming law have been injured due to restrictions imposed by the ESA and that due to the current restrictions on his water rights, he continues to be injured. (Pl.'s Mem. Opp'n to Mot. to Dismiss, Ex. 2.) Crowder alleges that he is an avid outdoorsman, and on March 20, 1999, he took a trip to the Platte River in Nebraska to observe the listed species. (Pl.'s Mem. Opp'n to Mot. to Dismiss, Ex. 3.) Crowder further contends that he intends to return next year and due to the inadequate water flows which could force the extinction of the listed species, both his esthetic and recreational enjoyment will be irretrievably harmed.

*Id.*

The Court must find that these allegations are sufficient to show injury in fact. *See Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (stating that harm to observe an animal species, even for esthetic reasons, is a cognizable interest for standing purposes).

▪ Regarding the second element of standing, that the *injury must be fairly* traceable to the challenged action, Plaintiff has met its burden. Plaintiff's Complaint generally states that the water shortages have harmed, and will continue to harm,

---

4. An association has standing if its members have standing to sue. *See Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In its motion to dismiss Defendants argued that no associational standing could exist because CSR had no members. However, Plaintiff has produced an authentic copy of an amendment to CSR's articles of incorporation, filed two days before this lawsuit was filed, which shows that the association now has members. CSR's associational standing has not otherwise been challenged and the Court finds that such requirements are present in accordance with *Hunt*.

the listed species on the Platte River in Nebraska. Finally, Bucholz's affidavit generally states that USFS's actions have caused his water rights to be harmed. Giving the plaintiff every benefit of the doubt, the Court finds that it has shown that the failure to implement proper vegetation and snow management techniques caused Bucholz's water rights restriction and the jeopardy to Crowder's future viewing of the listed species.

■ As for redressability, however, the plaintiff has failed to carry its burden regarding Bucholz. There is no allegation that a favorable decision by this Court would free up Bucholz's water.

■ As for Crowder, Plaintiff satisfies the redressability requirement at this stage. Plaintiff has submitted an abstract from the research paper of Charles F. Leaf, dated January 14, 1999. Mr. Leaf opines that environmentally sound patch-cutting techniques would increase water yields 249,000 acre-feet per year over existing levels. (Pl.'s Opp'n to Mot. to Dismiss, Ex. 4.) He concludes that this additional water would benefit the listed species in Nebraska. *Id.* Additionally, Plaintiff generally alleges that increased water would help the endangered species. At the motion to dismiss stage, this is sufficient to satisfy redressability.[5]

Therefore, Defendants' motion to dismiss on this ground must be **DENIED.**

### III. Ripeness

The Biodiversity Parties have moved to dismiss Plaintiff's ESA claims because they are not ripe. Ripeness is a concept

that is said to contain both constitutional and prudential considerations. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4, at 116 (2d ed.1994). The doctrine is constitutional because whether a case is ripe is inextricably intertwined with the case or controversy requirement. *See id.*

■ *Abbott Laboratories v. Gardner* is the perennial case in this area. 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In that case, the Supreme Court articulated the standard for ripeness that is used to this day: "The problem is best seen as a twofold aspect, requiring us to evaluate ... [1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507.

■ As a preliminary matter, Plaintiff has argued that the ripeness doctrine is not applicable to this case. This Court must disagree. Plaintiff argues that because it has brought this suit pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A) (1994), the proper standard for determining whether this case is proper for adjudication is found in *Forest Conservation Council v. Rosboro Lumber Co.,* 50 F.3d 781 (9th Cir.1995). While the Court agrees that the citizen suit provision negates Defendants' argument on exhaustion,[6] it does not agree that the ripeness doctrine is inapplicable to this case.

Plaintiff's reliance on *Rosboro Lumber Co.* for the stated proposition is misplaced.

---

5. The Court notes that if this was a motion for summary judgment, Plaintiff may not have satisfied standing because grave issues about the likelihood of water reaching species 300 miles away exist.

6. Defendants argued that because this Court is dealing with agency action in this case, this lawsuit must be brought under the Administrative Procedure Act. However, courts have recognized that the 60 day notice provision is effectively a waiver of exhaustion. *See Silver*

*v. Babbitt,* 924 F.Supp. 976, 987 (D.Ariz. 1995). The plaintiff has complied with the 60 day notice requirement in this case. Thus, the defendants' arguments that Plaintiff must comply with the procedures set forth in *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560 (10th Cir.1994), must fall short. The ESA has set forth a procedure where litigants can file their suit directly in court, rather than going through the administrative adjudication process. *See Silver,* 924 F.Supp. at 987.

In that case, the district court had concluded that the ESA requires a plaintiff to show either a past or current injury to a protected species. *See id.* at 783. The court of appeals disagreed, finding that the statutory scheme of the ESA clearly showed that imminent threats to wildlife were also actionable; that is, the ESA was designed to prevent *future* harm to animals as well. *See id.* at 784–86. The Court does not disagree with the Ninth Circuit's conclusion in that case, but that is not the issue in the case at bar. In the case at bar, the issue is whether this controversy is ripe for judicial review. As previously stated, ripeness is, in part, a constitutional limitation emanating from the case and controversy requirement of Article III. The Court thus finds that the ripeness doctrine is very applicable here, especially when one looks to the Supreme Court case of *Ohio Forestry Association v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

*Ohio Forestry* involves the very same issues that are present in this case, the only difference being that *Ohio Forestry* came before the Court via a different vehicle, the APA, not the ESA. *See Sierra Club v. Robertson,* 845 F.Supp. 485, 488 (S.D.Ohio 1994), *rev'd sub nom. Sierra Club v. Thomas,* 105 F.3d 248 (6th Cir. 1997), *vacated sub nom. by Ohio Forestry v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921. In *Ohio Forestry,* the Sierra Club challenged the Forest Plan for the Wayne National Forest in southern Ohio. *See* 118 S.Ct. at 1668. The Sierra Club challenged the Forest Plan because it favored logging and clearcutting in violation of the National Forest Land Management Act. *See id.* at 1669. However, a unanimous Supreme Court dismissed the Sierra Club's claims because they were not ripe. *See id.* at 1673.

The Supreme Court had three grounds for finding that the case was not ripe. These reasons and the Court's analysis are instructive and reveal substantial problems with the case at bar. Looking to the two factors enunciated above, Justice Breyer first noted that to withhold the court's consideration would not cause "hardship" to the parties. *See id.* at 1670. The provisions of the Forest Plan the Sierra Club challenged did not create adverse effects of a strictly legal kind, "that is, the effects of a sort that traditionally would have qualified as harm." *Id.* The Forest Plan did not "command anyone to do anything or to refrain from doing anything; they [did] not grant, withhold, or modify any formal legal license, power or authority; they [did] not subject anyone to civil or criminal liability; they [did] not create legal rights or obligations." *Id.* Further, the Supreme Court found that because the Forest Service had to follow certain procedures before a site could be logged, the Sierra Club could bring an action when the harm was more imminent. *See id.*

Second, the Supreme Court found that from the agency's perspective, immediate judicial review at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies through revision or through application of the plan in practice. *See id.* at 1671.

> Third, from the court's perspective, review of the Sierra Club's claims regarding logging and clearcutting now would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways and which effects themselves change over time.... All this is to say that further factual development would 'significantly advance our ability to deal with the legal issues present' and would 'aid us in their resolution.'

*Id.* at 1671–72 (quoting, in part, *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). As the Court will explain, these same considerations compel finding that this case is not ripe for judicial resolution.

██ But before the Court compares *Ohio Forestry* to the instant case, a few additional facts worthy of consideration must be discussed.[7] The Interveners have pointed out, and this Court tends to agree, that the main concern of the Plaintiff in this case is not the endangered species in the Platte River Basin, but in fact is the exercise of CSR's members' water rights along the Platte River that are currently restricted by the ESA. Indeed, it was not until March 20, 1999, that CSR got one of its members to attempt to observe the endangered species on the Platte River in Nebraska. Obviously, this was a sham attempt to show "harm."

Further, on July 1, 1997, the United States Secretary of the Interior, and the Governors of Colorado, Wyoming, and Nebraska, entered into a cooperative agreement establishing a comprehensive study of the endangered species dependent on the Platte River. (Interv.'s Mem. in Supp. of Mot. to Dismiss, Ex. A.) This agreement is known as the Platte River Endangered Species Partnership. The Department of Interior and the three participating states have established a budget of $2.9 million per year for the three years anticipated for the study. In addition to the governmental participants, many interested parties have participated in the Partnership. To date, the Partnership has conducted 11 public meetings in Nebraska, Wyoming, and Colorado, with nearly 500 attendees.

Finally, USFS is currently revising the Medicine Bow Forest Plan. This detailed process will be completed in 2001.

██ Given these facts, the Court sees many similarities between this case and *Ohio Forestry.* First, although this case is brought under the guise of the ESA, this case is really about the Forest Plan currently in place in the Medicine Bow. One need only look at CSR's complaint to recognize this. Second, although this case is brought under the ESA, this case is really about CSR's members' water rights along the Platte River. CSR's members are really concerned with their ability to sell their water. As such, while the fact that this case is brought under the ESA normally would distinguish the harms between these two cases, that is not the case here because these cases are, at their core, both about challenging forest plans.[8] When one accepts this general proposition, the plaintiff will not suffer hardship if the Court fails to address their concerns in this lawsuit. The plaintiff can go through the proper channels designed to solve the problem in this case, the Partnership process or through administrative adjudication.

Further, like *Ohio Forestry,* this action is hindering agency and other governmental attempts to change policy. The Partnership is currently working on a solution to the harm Plaintiff complains of. Short-circuiting these efforts would not only be unwise, but would be a waste of governmental resources. USFS is also currently revising its Forest Plan. The experts that should be considering these matters are working this problem, and this Court will not substitute its judgment for these parties. The issues before the Court are not fit for judicial resolution at this time.

And most importantly, like *Ohio Forestry,* this case involves challenges to an elab-

---

7. The Tenth Circuit has expressly recognized that a motion to dismiss on ripeness grounds is a motion pursuant to 12(b)(1) and facts outside the pleadings may be considered. *See SK Finance SA v. La Plata County, Board of County Comm'rs,* 126 F.3d 1272, 1275 (10th Cir.1997).

8. Although the plaintiff may try to argue that this case is more immediate because endangered species are at issue, this Court is not convinced that immediacy is an issue in this lawsuit. This is not a circumstance where USFS is going to cut down trees in which the spotted owl lives. Instead, this is a case where the plaintiff wants USFS to implement a long range program that would take months or years to increase water yield for the benefit of species 300 miles away. Accordingly, the Court is not convinced that because this lawsuit was brought under the ESA a more imminent harm has surfaced making this case ripe.

orate and technically based plan that would require time-consuming consideration. There are so many factors involved in the type of relief Plaintiff seeks that it would be impossible for this Court to determine and consider all of the possible impacts such remedies would have. This Court is only saying that further factual development would significantly advance a Court's ability to deal with the issues in this case. It is better to let the Partnership and USFS consider these matters. Again, the Court refuses to substitute its judgment for the wise and fair processes described above. The issues before the Court are not fit for judicial resolution at this time.

In sum, Plaintiff will not suffer significant hardship if the Court declines to exercise jurisdiction. Plaintiff more properly should bring these matters before the Partnership Process and before an administrative tribunal. Moreover, this Court would benefit from further factual development of the issues involved. The Biodiversity Parties' Motion to Dismiss on ripeness grounds is thus **GRANTED**.

## IV. Failure to State a Claim Upon Which Relief Can be Granted

■■■ Another alternative ground supports this Court's conclusion today. The federal defendants have also moved to dismiss Plaintiff's ESA claims because federal agencies have substantial discretion in how to implement their § 1536(a)(1) obligations and, accordingly, § 1536(a)(1) does not mandate that specific actions be taken by federal agencies. Recall that § 1536(a)(1) states that federal agencies shall utilize their authorities in furtherance of the purposes of the ESA to carry out programs for the "conservation" of endangered species.[9]

The case law is well settled that federal agencies are accorded discretion in determining how to fulfill their § 1536(a)(1) obligations. *See Pyramid Lake*, 898 F.2d at 1418. As Judge Kerr of this District stated: "While the affirmative nature of § 1536(a)(1) is beyond dispute, the definition of conservation in § 1532 proves some discretion in conservation measures." *National Wildlife Fed'n v. National Park Service*, 669 F.Supp. 384, 387 (D.Wyo. 1987).

The ESA's implementing regulations also support this proposition. *See Pyramid Lake*, 898 F.2d at 1418 (citing 50 C.F.R. § 402.14(j) for this proposition). In particular, 50 C.F.R. § 402.14(j) states that FWS may present the federal agency with a biological opinion, but such opinions are not mandatory, they are advisory only—therefore, how to implement "conservation" is ultimately left to the discretion of the agency. This discretionary authority is also apparent from FWS's statement in the Federal Register, where in adopting 50 C.F.R. § 402.14(j), it stated § 1536(a)(1) "does not mandate particular actions to be taken by Federal Agencies to implement" that provision. 51 Fed.Reg. 19,926, 19,934 (June 3, 1986). Of course, the interpretation of a statute by an agency charged with its administration is entitled to deference. *See Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

District courts and other authorities have also found that discretion is abundant under the provision. First, in a case where the plaintiffs alleged that the defen-

---

**9.** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be other relieved, may include regulated taking.

16 U.S.C. § 1532(3) (1994).

dants failed to take affirmative steps under § 1536(a)(1), the Court found that the claims were without merit because that section did not require that affirmative steps be taken. *See Hawksbill Sea Turtle v. FEMA,* 11 F.Supp.2d 529, 542–43 (D.VI.1998). Another district court observed that "[C]onservation plans under [Section] 7(a)(1) are voluntary measures that the federal agency has the discretion to undertake and the [ESA] does not mandate particular actions be taken by Federal Agencies to implement [Section] 7(a)(1)." *Strahan v. Linnon,* 967 F.Supp. 581, 596 (D.Mass.1997); *see also* J.B. Ruhl, *Section 7(a)(1) of the "New" Endangered Species Act: Rediscovering and Redefining the Untapped Power of Federal Agencies' Duty to Conserve Species,* 25 Envtl.L. 1107, 1132 (1995). Another court has reasoned that "[r]easonable people could disagree as to the proper level of activism required by an agency under the ESA. The court will not substitute its judgment for the agency's in deciding as a general matter that the totality of defendant's actions taken to protect threatened and endangered species were insufficient." *Defenders of Wildlife v. Administrator, Environmental Protection Agency,* 688 F.Supp. 1334, 1352 (D.Minn.1988), *aff'd in part and rev'd in part on other grounds,* 882 F.2d 1294 (8th Cir.1989).

This leads to the necessary and relevant question posed in this motion: Does an action brought under § 1536(a)(1) envision the type of affirmative injunctive relief sought by the Plaintiff? The Court has conducted an extensive review of the law in this area, and its research has not revealed one case where a court ordered the federal agency to take specific measures to land, such as ordering that vegetation and snow management programs be implemented. The absence of such a case makes sense: The courts are not in the best position to order a specific affirmative remedy such as clearing a forest.

Likewise, this Court is not the proper place to adjudge and declare that the de-

fendants have violated the ESA as a matter of law by not implementing the processes listed. The weighty decisions of what an affirmative act will do, in terms of USFS's statutory obligations and potential impact on the environment, is better left to the experts in this field. To order such action without going through the proper procedure of ordering analyses and impact statements is unthinkable and judicially irresponsible.

In sum, the ESA never envisioned such a remedy for violating § 1536(a)(1) and the Court finds as a matter of law that it will not entertain such an action today. Defendants' motion to dismiss Plaintiff's ESA claims is thus **GRANTED.**

## V. Plaintiff's FRRRPA Claim Must Be Dismissed

■■■ The federal defendants correctly point out that this Court has no jurisdiction over Plaintiff's FRRRPA claims because there is no waiver of sovereign immunity present. Because NFMA does not include provisions for judicial review, challenges to Forest Plans must be made under the general waiver of sovereign immunity found in the APA, 5 U.S.C. § 702 (1994). Plaintiff has not brought this cause of action through the APA, thus this claim must be dismissed.

Accordingly, Defendants' motion to dismiss Plaintiff's third Count is **GRANTED.**

### *Conclusion*

For the stated reasons, Plaintiff's Counts are **DISMISSED** because: (1) Plaintiff's ESA claims are not ripe, and (2) Plaintiff's ESA claims fail to state a claim upon which relief can be granted, and (3) Plaintiff's FRRRPA claim has not proceeded under a waiver of sovereign immunity. These claims are **DISMISSED WITHOUT PREJUDICE.** Each party shall bear their own costs.